**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **AMBER MAREE CANTER,** | * | |
| **(F/K/A CHARLES CANTER),** | | |
| | * | |
| **Plaintiff,** | | |
| **v.** | * | **Case No.: GJH-17-908** |
| | | |
| **ASHRAFF MAMBOOB,** *et al.,* | * | |
| | | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Amber Maree Canter, a transgender woman incarcerated at a Maryland state prison, filed this action *pro se* on April 3, 2017 against prison medical and supervisory staff alleging that they unconstitutionally failed to provide her with necessary medical care. ECF No. 1. Five months later, Plaintiff was released on parole, *see* ECF No. 21 at 2,[1] and the Defendants filed a Motion to Dismiss or for Summary Judgment, ECF No. 17. On March 26, 2018, the Court issued a Memorandum Opinion and an Order denying the Defendants' Motion with respect to Plaintiff's claims for damages and granted Plaintiff's Motion for Appointment of Counsel. ECF Nos. 21, 22. Plaintiff then filed an Amended Complaint, ECF No. 24. Plaintiff was reincarcerated shortly thereafter. *See* ECF No. 26. On April 10, 2019, Defendants filed a Motion to Dismiss or for Summary Judgment with respect to the Amended Complaint. ECF No. 28.

Over the months that followed, Plaintiff filed two emergency motions for temporary restraining orders related to her medical care and treatment, both of which were withdrawn after

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Defendants ceased the specified conduct at issue. ECF Nos. 37, 45. Additionally, after the

Motion to Dismiss or for Summary Judgment was fully briefed, Plaintiff submitted a Motion for

Leave to file a Second Amended Complaint to add new allegations concerning Plaintiff's

treatment since her reincarceration. ECF No. 44. Both motions are now pending before the

Court, as is a motion by Plaintiff for leave to file a surreply in opposition to Defendant's Motion

to Dismiss or for Summary Judgment. ECF No. 43.[2] No hearing is necessary. *See* Loc. Rule

105.6. (D. Md.). For the following reasons, the Court will deny the Motion to Dismiss or for

Summary Judgment and the motion to file a surreply, though some of Plaintiff's claims will be

dismissed, and will grant the Motion for Leave to File the Second Amended Complaint.

## I.    BACKGROUND

Because this case has an unusual posture, the Court discusses its procedural history

together with a review of the facts as they have evolved through each stage of the litigation.

### A.  Initial Complaint and Motions

Plaintiff filed her initial Complaint in this action on April 3, 2017, seeking declaratory

and injunctive relief, as well as compensatory and punitive damages, to address what she alleged

was the Defendants' deliberate indifference to her medical needs related to her gender dysphoria.

ECF No. 1. Plaintiff specifically alleged that the Maryland Department of Public Safety and

Correctional Services ("DPSCS") refused to acknowledge her condition, with which she was

diagnosed in 2013, and denied her hormone treatments that she had begun prior to her

incarceration, leading her to commit acts of self-injury and to attempt suicide 18 times. *Id.* at 6–

10. Plaintiff asserted that withdrawal from her hormone treatments caused debilitating physical

---

[2] Also pending are several motions to seal exhibits related to the withdrawn restraining orders, consent motions for extensions of time to file briefs, and motions to strike or replace government counsel. ECF Nos. 25, 27, 33, 36, 37, 39, 57, 58, 60, 67, 68. Because these motions are procedural and do not bear on the issues presented in the parties' substantive briefing, the Court addresses them only in the Order accompanying this Memorandum Opinion.

symptoms and that she had unsuccessfully sought treatment through various means on more than a dozen occasions over the preceding eight months. *Id.* at 10–12. The Complaint attached several exhibits of medical records and administrative complaints and letters that Plaintiff had filed. ECF Nos. 1-1, 1-2, 1-3, 1-4, 1-5, 1-6.

Named as Defendants were a number of prison medical and supervisory officials, including Stephen T. Moyer, Secretary of DPSCS; Dr. Randall Nero, Director of the DPSCS mental health department; Bruce Liller, the mental health program director at North Branch Correctional Institution ("NBCI"), the facility at which Plaintiff was incarcerated; Dr. Sharon Baucom, Director of Wexford Medical Services, a contractor that provided medical services at NBCI; Lauren Beitzel, a mental health counselor at NBCI; Dr. Harry Murphy, western region mental health director of DPSCS; Dr. Robustiano Barrera, western region medical director for DPSCS; Dr. Ashraff Mamboob, NBCI's "main medical provider"; Krista Bilak, a nurse practitioner at NBCI; and Jeffrey Nines, NCBI's Assistant Warden. ECF No. 1 at 3–6.

Plaintiff also moved for a preliminary injunction requiring Defendants to provide her treatment for her gender dysphoria. ECF No. 3. On April 11, 2017, the Court issued an Order to Defendants to Show Cause why injunctive relief should not be granted. ECF No. 5. In a response filed on May 9, 2017, Defendants maintained that Plaintiff had not been diagnosed with gender dysphoria and that a committee of officials had decided that she would soon be evaluated by a psychologist affiliated with Johns Hopkins Medicine, Dr. Chris Kraft. ECF No. 9 at 2. Defendants also stated that Plaintiff's case would be reassessed at the next committee conference on June 2, 2017. *Id.* Plaintiff filed a Reply on June 12, 2017, stating that there had been no reassessment of her case and that she had not met with Dr. Kraft. ECF No. 12. Based on the information Defendants had provided, however, the Court denied the preliminary injunction

pending further response from Defendants to Plaintiff's concerns. ECF No. 11 at 2. The Court

also denied without prejudice a request Plaintiff had filed for appointment of counsel. *Id.* at 3.

On September 11, 2017, Defendants filed a Motion to Dismiss the Complaint, or in the

Alternative, for Summary Judgment. ECF No. 17. Attached to the motion were several

declarations disputing the allegations in the Complaint. ECF Nos. 17-2, 17-4, 17-5, 17-6, 17-7.

Defendants made four arguments. First, they explained that Plaintiff had been released on parole

on September 5, 2017 and that her claims for equitable relief were thus moot. ECF No. 17-1 at 3,

8–10. With respect to Plaintiff's damages claims, Defendants asserted that Plaintiff had not been

diagnosed with gender dysphoria and had received abundant medical and mental health care

while incarcerated. *Id.* at 2, 7. Defendants did not address Plaintiff's allegations that she had

attempted self-harm and suicide. Next, Defendants argued that there was no basis for supervisory

liability for Defendants Moyer, Baucom, and Nero because they had no involvement in the

violations Plaintiff alleged. *Id.* at 8. Finally, Defendants argued that they were entitled to

qualified immunity. *Id.* at 10–11.

On March 26, 2018, the Court issued a Memorandum Opinion and an Order dismissing

as moot Plaintiff's claims for injunctive and declaratory relief but rejecting Defendants' attempt

to dispose of the damages claims. ECF Nos. 21, 22. Relying on the exhibits that Plaintiff

submitted in support of her Complaint, none of which Defendants had addressed, the Court

found that Plaintiff had adequately pleaded a deliberate indifference claim. ECF No. 21 at 9–11.

The Court noted evidence in the exhibits that Defendants were aware as early as October 15,

2015 that Plaintiff had "sex identity issues" and had received estrogen in the past. *Id.* at 9

(quoting ECF No. 1-1 at 14). The exhibits also showed that Plaintiff had authorized the release to

DPSCS of all medical information relating to her gender dysphoria on March 11, 2016, *id.* at 9–

10 (citing ECF No. 1-1 at 65), had sought gender reassignment medication as early as May 22, 2016, *id.* at 9 (citing ECF No. 1-1 at 28), had asked to be placed back on hormone therapy and sought treatment multiple times throughout 2016, *id.* at 10 (citing ECF No. 1-1 at 65, 67, 75), and in December 2016 had submitted two "sick call slips" stating that she was experiencing extreme pain from a self-castration attempt, *id.* (citing ECF No. 1-1 at 68, 75).

The Court highlighted two letters in the exhibits to the Complaint. In a July 11, 2016 letter to Plaintiff, Defendant Liller acknowledged that Plaintiff had been seen by multiple mental health providers in the past several years but asserted that none had offered a diagnosis of gender dysphoria. *Id.* (citing ECF No. 1-2 at 19). The letter also stated that "[a]ccording to DOC policy, one qualifying factor for anyone seeking hormonal therapy is that hormonal therapy prior to incarceration must be established." *Id.* (citing ECF No. 1-2 at 19). Second, in a December 2016 letter, acknowledged by Defendant Nero in a December 28, 2016 response, Plaintiff stated that she was diagnosed as having "gender identity disorder" at the psychiatric ward of the Maryland General Hospital Center, to which she was admitted from October 2012 through April 2013. *Id.* (citing ECF No. 1-2 at 2–4). Plaintiff also asserted that Defendants Liller and Beitzel were preventing her from receiving medical treatment by refusing to either provide a diagnosis of gender dysphoria or refer her to a professional who could do so. *Id.* (citing ECF No. 1-2 at 4).

The Court made special note of Defendants' assertion that Plaintiff was evaluated by Dr. Kraft on July 18, 2017, for which Defendants cited a declaration by Defendant Nero. *Id.* at 11. Neither the declaration nor any other source, however, provided evidence of the examination or its conclusions, and Plaintiff stated that she had not been seen by Kraft. *Id.* (citing ECF No. 12-2). At best, the Court found, Nero's declaration suggested that Kraft had not completed whatever evaluation he may have initiated. *Id.* at 11 n.4 (citing ECF No. 17-3 ¶ 4). In any case, the Court

found that Defendants' assurances that an assessment was forthcoming were evidence that Defendants knew Plaintiff was suffering. *Id.* Additionally, it was clear to the Court that Defendants' alleged refusal to evaluate Plaintiff for gender dysphoria perpetuated and exacerbated the issues she had repeatedly raised. *Id.* Unelaborated claims in Defendants' declarations that they had not hindered Plaintiff's treatment were insufficient, given Defendants' failure to dispute Plaintiff's allegations about her self-harm and suicide attempts. *Id.*

The Court concluded that genuine disputes of material fact remained as to whether Defendants were deliberately indifferent to Plaintiff's needs by not allowing her to be evaluated for gender dysphoria and providing her treatment if she were diagnosed. *Id.* The Court found no basis for qualified immunity because Defendants had not offered sufficient evidence to establish that they did not violate Plaintiff's Eighth Amendment rights. *Id.* at 11 n.5. Defendants could not credibly claim that Plaintiff's right to treatment was not clearly established, and the existing record did not show that it was objectively reasonable for Defendants to allegedly ignore her requests for care. *Id.* The Court did dismiss Defendant Moyer on the ground that Plaintiff had not alleged his personal involvement in the events at issue, but declined to similarly dismiss Defendants Baucom and Nero because their declarations suggested that they had personal knowledge and involvement with Plaintiff's treatment and were in a position to direct it. *Id.* at 12. Finally, the Court granted Plaintiff's renewed motion for appointment of counsel, ECF No. 14, and directed the parties to proceed to discovery. ECF No. 21 at 12–13.

**B. Amended Complaint**

On January 23, 2019, at the direction of the Court following a scheduling conference, Plaintiff through appointed counsel filed an Amended Complaint, which is the current operative pleading. ECF No. 24. In the new pleading, Plaintiff expands on the allegations in her original

*pro se* Complaint by incorporating information from her exhibits about Defendants' awareness of her condition and medical needs and by describing her experience with gender dysphoria prior to incarceration. Plaintiff specifically alleges that she was diagnosed in early 2013 with what was then called gender identity disorder and began hormone therapy at that time, though she obtained her medication on the "black market" because her insurance would not cover it. *Id.* ¶¶ 59–61; *see also id.* ¶ 47 (describing Plaintiff's diagnosis at Maryland General Hospital). Before she was incarcerated in April of that year, Plaintiff had sought care for her gender dysphoria from several different providers and institutions. *Id.* ¶¶ 64–65.

When she arrived at NBCI, however, Plaintiff was allegedly subject to DPSCS's so-called "Freeze Frame Policy" with regard to transgender inmates, which "freezes" them in their status when they are first incarcerated and prevents them from receiving hormonal treatments unless and until they are diagnosed with gender dysphoria. *Id.* ¶ 66. Pursuant to that policy, Plaintiff alleges, DPSCS and NBCI refused to recognize her pre-incarceration diagnosis or to provide her with the necessary psychological evaluation to obtain a diagnosis once incarcerated. *Id.* ¶ 67. As described previously, Plaintiff attempted to seek care by authorizing the release of her medical records and repeatedly requesting an evaluation or continuation of her hormone therapy. *Id.* ¶¶ 68–70. As a result of being denied care, Plaintiff suffered severe psychological and physical harm, including panic attacks, anxiety, sleep disturbance, and loss of appetite, and attempted self-castration and suicide on 18 separate occasions. *Id.* ¶¶ 71–72.

The Amended Complaint describes in detail the events that the Court found noteworthy in its prior Memorandum Opinion, as well as numerous other incidents in which Plaintiff sought care or intervention through DPSCS's administrative remedies throughout 2016 and 2017. *Id.* ¶¶ 81–105. These included nine "sickcall interviews" with nurses to discuss her condition, ten

requests for an evaluation and treatment for her gender dysphoria, and a letter to Defendant Nines. *Id.* ¶¶ 92–93, 96. At certain points, Plaintiff was sent to the Western Region Medical Center, another facility, for treatment for breast lumps and leakage that she developed, which a physician determined was caused by estrogen withdrawal. *Id.* ¶¶ 74–75, 97.

Despite this determination, however, Defendants allegedly refused to evaluate Plaintiff for gender dysphoria or to accept her earlier diagnoses. *Id.* ¶¶ 80, 90–91. Additionally, in one of several mental health counseling meetings with Defendant Beitzel, Beitzel informed Plaintiff that she "had been instructed not to give a diagnosis of gender dysphoria to [Plaintiff] because [Plaintiff] was a nuisance due to her requests for help and evaluations." *Id.* ¶ 99. The Amended Complaint also adds further detail concerning the response to Plaintiff's December 2016 letter, which asserted that Defendants Liller and Beitzel were preventing her from receiving medical treatment by refusing to diagnose or refer her. *Id.* ¶ 102. In his December 28, 2016 response, Defendant Nero stated that he would forward the letter to Defendant Murphy to ensure that Plaintiff's concerns were addressed. *Id.* ¶ 103 (citing ECF No. 1-2 at 2). Plaintiff alleges, however, that Nero and Murphy ultimately informed her that they would support whatever course of action was recommended by Liller and Beitzel. *Id.* ¶ 104.

The Amended Complaint also cites and describes two references related to gender dysphoria. The first, the World Professional Association for Transgender Health Standards of Care for the Health of Transsexual, Transgender, and Gender Non-Conforming People ("Standards of Care"), is recognized by the American Psychological Association, American Medical Association, and the Endocrine Society "as the authoritative articulation of professional consensus on the treatment of gender dysphoria." *Id.* ¶¶ 36–37. The Standards of Care provide for several treatments, some or all of which will be required depending on an individual's

specific medical needs. *Id.* ¶¶ 37–38. These include changes in gender expression and role as well as hormone therapy, surgery, and psychotherapy. *Id.* ¶¶ 38–39.

According to the Standards of Care, a "freeze-frame" approach to hormone therapy for people who are incarcerated is not appropriate care, and failing to initiate medically necessary hormone therapy risks a high likelihood of negative outcomes including "surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality." *Id.* ¶ 44. The Amended Complaint alleges that the Standards of Care have been endorsed by the National Commission on Correctional Healthcare ("NCCHC") and the U.S. Department of Justice National Institute of Corrections as the medically accepted standard for the treatment of inmates with gender dysphoria. *Id.* ¶ 43. The NCCHC specifically recommends that medical management of prisoners with gender dysphoria should follow the Standards of Care, and has further stated that policies making treatments available only to those who received them prior to incarceration are inappropriate and out of step with medical standards. *Id.* ¶ 45.

The Amended Complaint also discusses DPSCS's established protocol for evaluation and treatment of inmates with gender identity issues, which is contained in a policy document titled OPS.131.0001, Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria. *Id.* ¶ 48. In general, the policy provides that the Department shall diagnose, treat, and manage inmates with gender dysphoria in a manner consistent with appropriate treatment, custody, and security standards. *Id.* ¶ 49. In addition to defining the condition, the policy directs that if an inmate self-identifies criteria for gender dysphoria, a mental health clinician shall meet with the inmate and review available medical and mental health history to determine if the inmate meets criteria for a provisional diagnosis. *Id.* ¶ 52. The policy also provides that if a new inmate is under hormonal therapy as part of an established

regimen for gender dysphoria, DPSCS's contracted medical services provider shall continue the treatment if it determines that the regimen is not contraindicated. *Id.* ¶ 54. If it is contraindicated, the contract provider must record that finding, explain the rationale for discontinuing hormone therapy to the inmate, and refer the inmate to a mental health clinician. *Id.* ¶ 55.

The Amended Complaint removed some of the Defendants from the original Complaint, naming Nero, Baucom, Murphy, Mamboob, Liller, Beitzel, and Nines. *Id.* ¶¶ 19–25.[3] Three counts are asserted against all Defendants: a claim under 42 U.S.C. § 1983 for refusal to provide medically necessary care in violation of Plaintiff's Eighth Amendment rights, *id.* ¶¶ 113–21; a claim of intentional infliction of emotional distress, alleging that Defendants intentionally caused Plaintiff severe emotional distress through extreme, reckless, and outrageous conduct motivated by ill will, hatred, and evil intent, *id.* ¶¶ 123–25; and a claim under § 1983 for violation of Plaintiff's civil rights through the failure by Nero, Baucom, Murphy, Liller and Nines to properly train and supervise Mamboob and Beitzel, *id.* ¶¶ 127–36. For relief, the Amended Complaint seeks a declaration that Defendants' refusal to provide Plaintiff medically necessary care violated her Eighth Amendment rights, $25,000 in compensatory damages, and $50,000 in punitive damages. *Id.* at 27.

### C. Dispositive Motion, Reincarceration, and First Temporary Restraining Order

On April 10, 2019, Defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. ECF No. 28. Defendants again attached declarations from Baucom, Nero, Liller, Nines, Beitzel, and Murphy, as well as a "Note" prepared by Dr. Kraft dated July 18, 2017 that reports a meeting with Plaintiff. ECF Nos. 28-3, 28-5, 28-6, 28-7, 28-8, 28-9, 28-10. In his

---

[3] The spellings of some of the Defendants' names have varied across the parties' filings. The Court employs what appear to be the correct spellings but will direct the Clerk to correct the docket as to any names that the Court is informed are misspelled.

declaration, Nero states that Plaintiff was released from DPSCS's physical custody and placed on parole on September 5, 2017. ECF No. 28-5 ¶ 1. Plaintiff filed a brief in Opposition on June 24, 2019, ECF No. 32, and attached a declaration from her counsel under Federal Rule of Civil Procedure 56(d) arguing that Defendants' motion was premature and that additional discovery would preclude entry of summary judgment. ECF No. 32-2 ¶ 16. The declaration also cast doubt on the reliability of the Kraft Note and attached emails between counsel that indicate, according to the declaration, that Dr. Kraft had prepared the Note in 2019 and backdated it to July 18, 2017. *Id.* ¶ 13 (citing ECF Nos. 32-3, 32-4).

The Court granted Defendants' consent motion for an extension of time to file their Reply. ECF Nos. 34, 35. During the extension period, Plaintiff filed an Emergency Motion for a Temporary Restraining Order ("First TRO") seeking to compel Defendants to continue her hormone therapy. ECF No. 37.[4] Although the motion and a supporting memorandum did not clearly say so, an affidavit by Plaintiff that she attached to a subsequent filing explained that while she was released on parole on September 5, 2017, she was reincarcerated on February 23, 2019. ECF No. 43-1 ¶¶ 13–14. Plaintiff was initially housed at the Maryland Reception, Diagnostic and Classification Center ("MRDCC") before being transferred to Western Correctional Institution ("WCI") in early or mid-July 2019. *Id.* ¶¶ 14–16.

The First TRO motion sought an order compelling Defendants and DPSCS to provide hormone treatments to Plaintiff at WCI. ECF No. 37-1 at 7–8. According to the Motion, Defendants were providing Plaintiff with the appropriate treatment during her time at MRDCC but had not continued it after her transfer to WCI. *Id.* at 1–2. Plaintiff filed the emergency motion after correspondence between counsel failed to resolve the issue. *Id.* at 2–3. In an Opposition,

---

[4] The motion also sought an order compelling Defendants to address Plaintiff by her legal name, which she had since changed. ECF No. 37 at 2. Plaintiff has not pursued that issue further.

Defendants stated that the matter was moot because Plaintiff was properly administered her medications on July 29, 2019. ECF No. 38-1 at 3, 6. Defendants maintained that if there had been a disruption in Plaintiff's treatment after her transfer, which Defendants denied, Plaintiff had only missed a single dose of her medication, which Defendants argued did not rise to the level of a constitutional violation. *Id.* at 12.

In her Reply, Plaintiff conceded that her hormone therapy had resumed on July 29, 2019 and that immediate injunctive relief was no longer required, though Plaintiff took the opportunity to dispute Defendants' characterizations of the events that had taken place since her transfer to WCI. ECF No. 41 at 1–4.[5] On September 6, 2019, Defendants filed a Reply in support of their Motion to Dismiss or for Summary Judgment with respect to the Amended Complaint. ECF No. 42. On September 24, 2019, Plaintiff filed a motion for leave to file a surreply to respond to what she claimed were arguments in Defendants' Reply that were beyond the scope of Defendants' Motion. ECF No. 43. In the alternative, Plaintiff asked the Court to disregard the new arguments. *Id.* ¶¶ 29–30.

### D. Motion for Leave to File Second Amended Complaint and Second TRO

On October 1, 2019, Plaintiff filed a Motion for Leave to File a Second Amended Complaint. ECF No. 44. The proposed Second Amended Complaint (the "proposed SAC") largely maintains the allegations from the Amended Complaint, which concerned Plaintiff's incarceration at NBCI before her release in September 2017, but names new defendants and adds new allegations concerning her treatment at MRDCC and WCI since she was reincarcerated in February 2019. To the original allegations, the SAC adds assertions that nurses made records of Plaintiff's sickcall visits and that Plaintiff specifically advised Defendants of her prior gender

---

[5] Plaintiff's TRO motion, ECF No. 37, remains pending on the Court's docket but will be denied as moot.

dysphoria diagnosis and the identities of health care providers who would have relevant records. *Id.* ¶¶ 75, 104. Plaintiff also adds allegations concerning Dr. Kraft, asserting that she was incarcerated at WCI on July 18, 2017 and was summoned to the facility's medical office that day, where Dr. Kraft introduced himself as the new chair of the "Gender Disorder Committee." *Id.* ¶ 118. Dr. Kraft advised Plaintiff that he would schedule an evaluation appointment for her at some point in the future but did not make a diagnosis, nor did he schedule the appointment. *Id.*

Plaintiff also makes new allegations about health care she received after she was released on parole. Plaintiff alleges that she was evaluated by the Johns Hopkins Gender Identity Clinic, which obtained her medical records from Maryland General Hospital. *Id.* ¶ 122. According to Plaintiff, the Clinic conducted a day-long evaluation that included interviews of Plaintiff and her mother. *Id.* Plaintiff was also evaluated by Dr. Kraft. *Id.* After the evaluation, the Clinic confirmed Maryland General Hospital's previous diagnosis of gender dysphoria and prescribed hormone therapy in the form of bi-weekly injections of Delestrogen, an artificial form of estrogen, and a daily tablet of Spironolactone, a testosterone blocker. *Id.*

Plaintiff additionally claims that sometime after February 28, 2019, at the direction of counsel for Defendants, Dr. Kraft prepared the "Note" dated July 18, 2017, ECF No. 28-10, that Defendants submitted in support of their Motion to Dismiss or for Summary Judgment with respect to the Amended Complaint. ECF No. 44-1 ¶ 123. Because Dr. Kraft did not conduct an evaluation of Plaintiff during their brief meeting in July 2017, Plaintiff believes that the diagnosis in the Note reflects the conclusions that were reached by the Johns Hopkins Gender Identity Clinic during her visit there and that Dr. Kraft backdated the Note at Defendants' counsel's direction. *Id.* ¶¶ 123–24.

The proposed SAC then turns to Plaintiff's treatment since her reincarceration in February 2019. *Id.* ¶¶ 125–26. While housed at MRDCC, Plaintiff alleges that she continued receiving her prescribed hormone therapy, including a scheduled Delestrogen shot on July 3, 2019. *Id.* ¶ 126. Plaintiff was then transferred to WCI, which is located in Cumberland, Maryland, immediately adjacent to NBCI. *Id.* ¶¶ 126–27. Upon her arrival, Plaintiff was housed on the so-called honor tier, a relatively less restrictive environment, and was assigned to a prison job that earned her ten good conduct credits each month. *Id.* ¶ 143.

According to the proposed SAC, employees at NBCI and WCI are drawn from the same local community, and it is not uncommon for an inmate deemed a "troublemaker" at one institution to be harassed and retaliated against by personnel at the other. *Id.* ¶¶ 127–28. When Plaintiff arrived at WCI, she alleges, personnel there were aware that this suit was pending against NBCI staff and almost immediately took acts in retaliation against her, including denying her medical care. *Id.* ¶¶ 129–30. Specifically, Plaintiff was due for her next Delestrogen injection on or about July 17 or 18, 2019, but was refused the injection when she requested it at WCI's medical office. *Id.* ¶¶ 131–32. One of the new defendants added by the proposed SAC, WCI medical director Brenda Reese, indicated that Plaintiff would not be allowed her next injection until August 2019. *Id.* ¶¶ 29, 133. Since Plaintiff's transfer to WCI, Plaintiff alleges, Reese has repeatedly indicated that she would allow Plaintiff to receive injections only on a monthly basis, not bi-weekly as prescribed. *Id.* ¶ 134. Plaintiff believes Reese's position is motivated by the cost of the medication rather than any medical consideration. *Id.* ¶ 135.

The proposed SAC then recounts the events at issue in the First TRO, alleging that Plaintiff's counsel's interactions with Defendants' counsel put Defendants on notice of the WCI medical office's failure to provide Plaintiff with her required treatment. *Id.* ¶¶ 137, 140. Next,

14

the proposed SAC describes Plaintiff's interactions with new Defendant Bittinger, identified only by his surname, who was Plaintiff's case manager at WCI. *Id.* ¶ 30. On July 29, 2019, Plaintiff alleges, Bittinger came to her cell, called her into the hallway, and told her to "stop being so needy" and that "this is a prison" and she could not obtain medication whenever she wanted. *Id.* ¶ 141. Bittinger told Plaintiff that her hormone therapy would not resume until August 2, 2019, and that if she wanted to remain housed in the honor tier, she had to "back off medical" and stop calling her attorneys. *Id.* Plaintiff called her attorneys that day and informed them of Bittinger's threats, which counsel in turn shared with Defendants' counsel. *Id.* ¶ 145.

On August 8, 2019, Plaintiff alleges that she was called to the medical office for an appointment. *Id.* ¶ 150. Plaintiff encountered new Defendant Correctional Officer II Faust, who said to her "here comes the snitch." *Id.* When Plaintiff asked to use the restroom while waiting for her appointment, Faust responded by removing a pepper spray can from his belt and threatening her, and "direct[ing] her to 'lock in the [expletive] holding cell before I spray you." *Id.* Plaintiff's counsel informed Defendants' counsel of this incident. *Id.* ¶ 151. On August 22, 2019, Plaintiff submitted a Request for Administrative Remedy regarding Faust's behavior, and her counsel asked Defendants' counsel to address the issue with prison officials. *Id.* ¶ 152.

On August 15, 2019, Defendants stopped administering Plaintiff's daily Spironolactone tablet. *Id.* ¶ 153. On August 19, WCI personnel advised Plaintiff that her hormone therapy was being "cancelled" immediately. *Id.* ¶ 154. Plaintiff alerted her counsel that Reese had failed to provide her medication for five days. *Id.* ¶ 157. The following day, Plaintiff was called to the medical office and told by Reese that the facility "was 'tired of answering to the Attorney General's Office'" and that therefore, at the direction of Baucom, WCI was making Plaintiff's medical care her own responsibility. *Id.* ¶ 155. Accordingly, Reese handed Plaintiff a month's

supply of Spironolactone and told her that she needed to self-administer it in the future rather than coming to the medical office. *Id.*

Reese also told Plaintiff, without explanation, that her endocrinologist "was being 'changed.'" *Id.* ¶ 156. Since that time, Reese has refused to assign Plaintiff a new endocrinologist. *Id.* On September 10, 2019, Reese informed Plaintiff that Plaintiff would not be permitted to see an endocrinologist for nine to twelve months. *Id.* ¶ 158. Two days later, Plaintiff began experiencing discharge from her left breast. *Id.* ¶ 159. Having been previously advised by physicians that she should immediately seek medical attention when she experiences such discharge, Plaintiff requested an examination at the medical office, but Reese refused. *Id.* The same day, Plaintiff encountered Ryan Youngbar, a prison administrator responsible for processing inmate medical requests for administrative relief. *Id.* ¶ 160. Plaintiff asked Youngbar why she was not allowed to visit the medical office to be examined for the discharge. In Plaintiff's presence, Youngbar called Reese and asked if Plaintiff could be seen. *Id.* Youngbar relayed Reese's response to Plaintiff, which was that Plaintiff would not be seen and that Plaintiff should contact her attorneys if she was not satisfied with Reese's decision. *Id.*

The following day, Plaintiff's counsel visited her at WCI. *Id.* ¶ 162. Numerous WCI personnel were aware of the meeting. *Id.* On September 17, 2019, new Defendant Correctional Officer Thompson came to Plaintiff's cell twice and demanded that she withdraw her complaint against Faust, which she refused both times. *Id.* ¶¶ 163–64. After Plaintiff's second refusal, Thompson, who was visibly agitated, "slammed the paperwork through the feed up slot" on Plaintiff's cell door. *Id.* ¶ 165. Thompson told Plaintiff that he was "not afraid of her '[expletive] lawyers'" and that he would cause her to lose her prison job and her privileges. *Id.* ¶ 165. At

approximately 6:30 that evening, another officer approached Plaintiff's cell and told her she was being transferred to "lock up." *Id.* ¶ 166.

Upon arriving, Plaintiff was told by new Defendant Officer Barnes that she could return to her honor tier cell if she withdrew the complaint against Faust. Plaintiff was later told, however, that her transfer was in response to a note making a threat against her that an officer had intercepted. *Id.* ¶ 168. Plaintiff told prison staff that she did not believe her life was in danger because Thompson and Barnes had attributed her transfer to her refusal to drop her complaint against Faust. *Id.* Plaintiff also asked to be allowed to sign a "body waiver" accepting the purported risk of returning to the honor tier, but the request was denied. *Id.* Additionally, Plaintiff filed a request for administrative remedy claiming that her housing assignment was retaliatory. *Id.* ¶ 169. The request was almost immediately dismissed. *Id.*

The proposed SAC alleges that as a result of being placed in segregation, Plaintiff has lost her prison job, is confined to her cell for 23 hours per day, and is only able to call her attorneys one morning per week for a maximum of 30 minutes. *Id.*[6] Plaintiff called her counsel daily while housed on the honor tier but was unable to speak with them for more than a week after being placed in segregation. *Id.* ¶ 172. Plaintiff and the other inmate with whom she is housed in segregation are also subject to continuous, severe, and pervasive sexual harassment by two correctional officers, Lieutenant James Smith and Officer Robey. *Id.* ¶ 170. The officers repeatedly approach the cell door and make lewd and crude comments and suggestions to Plaintiff and the other inmate regarding their sexual orientation and expressed gender, including by describing sexual acts they might perform. *Id.*

---

[6] While the parties do not dispute that Plaintiff is no longer in segregation, the Court restates the proposed SAC's allegations about that period in the present tense, as alleged in the pleading.

Plaintiff alleges that several of the existing and new defendants have implemented, condoned, and ratified policies that have led to her treatment, including policies of punishing and retaliating against inmates who complain about medical and correctional personnel and of denying medically necessary treatment for gender dysphoria pursuant to the "freeze-frame" policy. *Id.* ¶¶ 175–77. Defendants allegedly responsible for these policies include existing Defendants Baucom and Murphy, as well as three new Defendants: J. Michael Ziegler, Acting Secretary of DPSCS, *id.* ¶ 19; Richard J. Graham, the warden of WCI, *id.* ¶ 27; and Ronald Weber, the Acting Assistant Warden of WCI, *id.* ¶ 28.[7] Plaintiff asserts that these Defendants, along with existing Defendant Nero, have failed to train and supervise DPSCS employees and agents with respect to treating gender dysphoria and responding appropriately to inmates who exercise constitutional rights. *Id.* ¶¶ 178, 181. Plaintiff also claims that these Defendants are aware of retaliatory actions by Reese and the interruptions of Plaintiff's necessary hormone therapy, as well as the retaliatory actions of Faust, Thompson, and Barnes, including placing Plaintiff in segregation, but have taken no corrective or disciplinary action. *Id.* ¶¶ 178–80.

In its claims for relief, all of which are asserted against all Defendants, the proposed SAC maintains unchanged the Eighth Amendment deliberate indifference claim from the Amended Complaint. *Id.* ¶¶ 182–91. It also maintains the intentional infliction of emotional distress and failure to properly train and supervise claims, though it adds to both alleged conduct at WCI. *Id.* ¶¶ 192–215. Specifically, in the failure to train claim, the proposed SAC alleges that Zeigler, Nero, Baucom, Graham, and Weber failed to properly train and supervise Defendants Reese, Faust, Thompson, and Barnes and took no corrective action despite actual and constructive

---

[7] The proposed SAC also corrects the name of Defendant Ashraff Mamboob to Mahboob Ashraf, M.D. ECF No. 44-1 at 1. The Clerk shall correct Dr. Ashraf's name on the docket.

knowledge of Reese's denial of medical care to Plaintiff and the officers' retaliatory actions against her. *Id.* ¶¶ 206–215.

The proposed SAC adds a new § 1983 claim for retaliation, which alleges that Plaintiff's filing of this action, her administrative complaint against Faust, and her communications with attorneys, are activities protected under the First and Eighth Amendments and that Defendants seek to intimidate her to stop her from exercising those rights. *Id.* ¶ 217–19, 224. Plaintiff alleges that Reese, Faust, Thompson, and Barnes have retaliated against her and that the remaining Defendants have actual or constructive knowledge and have permitted and condoned the retaliation. *Id.* ¶¶ 220–22. Plaintiff also adds a count seeking a permanent injunction to bar Defendants from interfering with her medical treatment and her exercise of her rights under the First, Eighth, and Fourteenth Amendments. *Id.* ¶¶ 228–33. The injunction would direct Defendants to provide Plaintiff with all prescribed medications and medical care and to restore her job and return her to the honor tier. *Id.* at 50. It would also prohibit Defendants from retaliating against Plaintiff in connection with her security status, housing, or prison work assignments. *Id.* at 51. The proposed SAC also increases the compensatory and punitive damages sought to $100,000 each.

Concurrently with her Motion for Leave, Plaintiff filed a second Emergency Motion for a Temporary Restraining Order ("Second TRO") raising the conditions of her segregation and sought an order directing Defendants to return her to the honor tier and to investigate her complaint against Faust. ECF No. 45. After a teleconference with the Court, Defendants filed a Response to the Second TRO on October 11, 2019, explaining that Plaintiff was returned to her former tier and cell on October 4, 2019 and had resumed her job. ECF No. 62 at 2. Defendants further stated that Plaintiff's administrative complaint against Faust had been investigated and

dismissed because video of the alleged incident contradicted Plaintiff's account. *Id.* While

Plaintiff has a right to appeal that decision, the process has not yet been exhausted, Defendants

contended. *Id.* The same day, after an additional call, the Court issued an Order denying the

Second TRO as moot. ECF No. 64. On October 15, 2019, Defendants filed a Response in

Opposition to Plaintiff's Motion for Leave to file the proposed SAC. ECF No. 65. Plaintiff filed

a Reply in support of the motion on October 29, 2019, ECF No. 66, attaching a revised proposed

Second Amended Complaint modifying the parties and adding factual allegations. ECF No. 66-1.

## II.  DISCUSSION

The primary motions pending before the Court are Defendants' Motion to Dismiss or for

Summary Judgment with respect to the Amended Complaint and Plaintiff's Motion for Leave to

file the proposed SAC. The Court considers Plaintiff's Motion first because its disposition

impacts the Court's consideration of Defendants'. "When a plaintiff files an amended complaint,

it generally moots any pending motions to dismiss because the original complaint is superseded."

*Venable v. Pritzker*, No. GLR-13-1867, 2014 WL 2452705, at *5 (D. Md. May 30, 2014) (citing

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 456 n.4 (2009)). "Yet, a pending

motion to dismiss is not mooted under all circumstances, and [d]efendants should not be required

to file a new motion to dismiss simply because an amended pleading was introduced while their

motion was pending." *Due Forni LLC v. Euro Rest. Sols., Inc.*, No. PWG-13-3861, 2014 WL

5797785, at *2 (D. Md. Nov. 6, 2014) (alteration in original) (internal quotation marks omitted)

(quoting *Venable*, 2014 WL 2452705, at *5). "Rather, "[i]f some of the defects raised in the

original motion remain in the new pleading, the court simply may consider the motion as being

addressed to the amended pleading." *Id.* (alteration in original) (quoting *Venable*, 2014 WL

2452705, at *5).

## A. Plaintiff's Motion for Leave to File the Proposed SAC

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to parties to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). The Fourth Circuit has "interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" *Id.* (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)); *see also Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012). "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (quoting *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)) (explaining that the plaintiff's proposed amendment would be futile if the new claim it added would not survive a Rule 12(b)(6) motion to dismiss).

Defendants argue that granting Plaintiff's motion for leave would be futile and prejudicial. With respect to futility, Defendants first challenge the viability of Plaintiff's Eighth Amendment claim of deliberate indifference to her medical needs. The Court already held in its prior Memorandum Opinion that Plaintiff has sufficiently pleaded that claim and Defendants offer no grounds to reconsider that holding here. Defendants additionally argue that Plaintiff has not exhausted her administrative remedies. Defendants do not specify which claim they refer to with this argument – in fact, their brief does not directly mention any of Plaintiff's claims

besides the deliberate indifference claim – but presumably their objection is to Plaintiff bringing to Court the facts of her August 22, 2019 request for an administrative remedy against Faust.

"Under the Prison Litigation Reform Act of 1995 ('PLRA'), as amended, prisoners must exhaust 'such administrative remedies as are available' prior to filing suit in federal court challenging prison conditions." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (quoting 42 U.S.C. § 1997e(a)). However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Id.* The Supreme Court in *Ross v. Blake* expanded on the definition of "available" under PLRA, as Judge Motz of this Court summarized in *Washington v. Rounds*:

> First, "an administrative procedure is unavailable when despite what regulations or guidance materials may promise it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." [*Ross v. Blake*, 136 S. Ct. 1850,] 1859 [(2016)]. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

223 F. Supp. 3d 452, 460 (D. Md. 2016) (footnote omitted). Generally, "[p]rison officials may not take unfair advantage of the exhaustion requirement and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance, or if they otherwise act to prevent a prisoner from exhausting his administrative remedies." *Id.* at 459.

Here, Plaintiff maintains that Defendants prevented her from pursuing her administrative remedies for her grievance against Faust. Plaintiff specifically points to the events of September 17, 2019, when Defendant Thompson allegedly twice visited her cell to demand she withdraw her complaint against Faust, "slammed the paperwork through the feed up slot" on Plaintiff's cell door, and told her that he was "not afraid of her '[expletive] lawyers'" and that he would cause

her to lose her prison job and her privileges. ECF No. 44-1 ¶¶ 163–65. Plaintiff further alleges that she was transferred to "lock up" by another officer that day and was told by Defendant Barnes that she could return to the honor tier if she withdrew the complaint. *Id.* ¶ 166. While in lock up, Plaintiff had limited access to a telephone, restricting her ability to contact her lawyers. *Id.* ¶ 169. Plaintiff argues that lockup thus effectively denied her the opportunity to pursue her administrative remedies. ECF No. 66 at 7.

Plaintiff does not contest, however, that she is no longer in lock up, as Defendants asserted in opposing the Second TRO. ECF No. 62 at 2. Further, Plaintiff states that she "continues to use all available mechanisms to resolve her administrative claims," but offers no other information on the status of those proceedings. ECF No. 66 at 7. Defendants, meanwhile, have provided a declaration from an employee of DPSCS's Inmate Grievance Office, to which appeals from denials of administrative claims are submitted, stating that no appeal had been received from Plaintiff as of October 15, 2019. ECF No. 65-1; *see Washington*, 223 F. Supp. 3d at 460 n.3 (describing the appeal process for inmate administrative claims). It thus does not appear, from the limited record before the Court at this stage, that Plaintiff has fully exhausted her administrative remedies with respect to her complaint against Faust.

Nonetheless, the Court will not deny the Motion for Leave on exhaustion grounds because Defendants' argument on this issue is vague and unspecified. Defendants offer no explanation of which elements or claims in the proposed SAC are preempted by Plaintiff's purported failure to exhaust; they state only that "the exhaustion requirement clearly extends to the Plaintiff's claim." ECF No. 65 at 8. "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a jurisdictional requirement, and thus inmates need not plead exhaustion, nor do they bear the burden of proving it." *Moore*, 517 F.3d at 725. While Plaintiff

most directly discusses her allegations against Faust in her retaliation claim, that claim additionally asserts that Reese's failure to provide Plaintiff with care was retaliatory. ECF No. 44-1 ¶¶ 217–27. Given that it is Defendants' burden to demonstrate lack of exhaustion, the Court will not attempt to extract aspects of Plaintiff's claim that concern Officer Faust without Defendants clearly identifying the deficiencies they claim are in the pleading.

With respect to prejudice, Defendants make a number of unconnected and unconvincing claims. First, Defendants argue that because the new claims in the proposed SAC do not arise out of the same conduct as the original pleading, allowing Plaintiff to add claims "that will not relate back to the original claims is fundamentally unfair." ECF No. 65 at 3. In support, Defendants cite Federal Rule of Civil Procedure 15(c)(1)(B), apparently attempting to invoke the rules for relation back of an amended pleading to the date of the original pleading. *See id.* That concept has no relevance here. Defendants next argue that Plaintiff's amendment should be denied because it is "belated" and would "change the nature of the litigation." ECF No. 65 at 3 (quoting *Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987)). Essentially, Defendants claim that it would prejudice the Defendants who interacted with Plaintiff only at NBCI to allow claims against the new WCI Defendants in the same suit. While a pleading that seeks backward-looking damages claims against one set of Defendants and both backward- and forward-looking relief against another set is somewhat unwieldy, the Court is unpersuaded that it would be unduly prejudicial.

As Plaintiff argues persuasively, the proposed SAC alleges a single, continuous fact pattern: Plaintiff was denied prescribed medical care at NBCI, initiated administrative complaints and a lawsuit against the prison staff and their supervisors, was released but then reincarcerated at an adjoining facility, and was both denied the same medical care and retaliated against by WCI staff who are supervised by the same officials as the NBCI staff. While the

24

proposed SAC increases the temporal scope of the action, its general nature remains the same.

Notably, Defendants incorrectly claim that Plaintiff has added an intentional infliction of

emotional distress claim in the new pleading and that "[t]here is no claim of personal animosity

by any of the NBCI Defendants" in the Amended Complaint. *Id.* at 6. In fact, the Amended

Complaint included an intentional infliction claim in which Plaintiff alleged that Defendants

"were motivated by ill-will, hatred and evil intent" and that "their actions were malicious,

unnecessary, willful, [and] wanton." ECF No. 24 ¶ 124.

Defendants cite two cases to support their position, neither of which actually provides

support. First, in *Deasy v. Hill*, a medical malpractice case, the Fourth Circuit held that in

proposed amendments to pleadings, "belated claims which change the character of litigation are

not favored." 833 F.2d at 42 (citing *Isaac v. Harvard Univ.*, 769 F.2d 817, 829 (1st Cir. 1985)).

In that case, however, the plaintiff moved to amend his complaint "immediately before trial." *Id.*

at 39. Further, the plaintiff's original complaint alleged only a negligence claim that "raised a

purely factual question, the resolution of which required no medical expertise." *Id.* at 41. The

plaintiff's proposed amendment, however, "sought to raise an issue of medical competence and

to alter substantially the nature of the lawsuit." *Id.* at 42. The court explained that "[t]he proof

required to defend against this new claim would be of an entirely different character than the

proof which the defendant had been led to believe would be necessary." *Id.*

No such concerns are presented here. This case remains at a relatively early stage. And

the new retaliation claim and request for an injunction do not change the type of discovery or

proof required. *Deasy* is thus readily distinguishable. So too is *Smith v. Angelone*, in which the

Fourth Circuit affirmed a denial of a motion for leave to amend a habeas petition. 111 F.3d 1126,

1134–35 (4th Cir. 1997). As in *Deasey*, the plaintiff in *Smith* moved to amend "literally on the

eve of trial," well after discovery was complete. *Id.* at 1134. Further, the purpose of the amendment was to add new claims of prosecutorial misconduct based on taped interviews of police officers that the plaintiff had been made aware of some nine months earlier. *Id.* In light of these considerations, the Fourth Circuit affirmed the District Court's finding that allowing the amendment "would have required the State's 'lawyers [to] spend additional time, money, and energy laboring in this Court's trenches,'" a passage on which Defendants here rely. *Id.* In this case, however, without even an Answer, let alone completed discovery, Defendants cannot credibly claim prejudice based on delay and the need for their counsel to expend additional effort to defend against Plaintiff's claims. Incidentally, if the Court were to deny the motion for leave on prejudice grounds, Plaintiff would be free to file an additional suit raising the WCI allegations, presumably creating a greater resource burden for Defendants and their counsel.

Finally, Defendants argue that the Court should not allow Plaintiff to add J. Michael Ziegler, Acting Secretary of DPSCS, because the Court previously dismissed his predecessor, Director Stephen Moyer. Defendants cite no authority, however, for their apparent assumption that a Plaintiff may not name a defendant in an amended pleading simply because that defendant's predecessor in office was dismissed from the case. Further, Defendants do not claim that Ziegler had no personal involvement in the alleged violations, which was the ground on which the Court dismissed Moyer from the original Complaint. *See* ECF No. 21 at 12.[8] In the proposed SAC, Plaintiff specifically pleads that Zeigler had actual or constructive knowledge of threats made against her for exercising her constitutional rights, implemented and condoned the DPSCS practice of denying treatment to inmates with gender dysphoria, and is aware of

---

[8] The Court takes this opportunity to underscore that Moyer is no longer a party to this case. Both parties have mentioned him in filings subsequent to the Court's Order dismissing him, including Plaintiff's Amended Complaint, which erroneously maintained his name in the case caption and included allegations against him that have correctly been removed from the proposed SAC.

retaliatory actions taken against her, among other allegations. *See, e.g.*, ECF No. 44-1 ¶¶ 146, 175, 177, 179. The Court thus declines to dismiss Ziegler at this stage.

Accordingly, because none of Defendants' arguments in opposition to the Motion for Leave are persuasive, the Court will grant Plaintiff's Motion for Leave to file the proposed SAC, ECF No. 44-1, and will treat it as the operative pleading. The Court notes that Plaintiff has attempted to file a revised version of the proposed SAC, ECF No. 66-1, as an attachment to her Reply in support of the Motion for Leave. The Court will not accept that filing. Local Rule 103.6 provides that a party moving for leave to file an amended pleading must include the proposed amended pleading with the motion. The Rule makes no provision for amendments of pleadings as attachments to briefs. If Plaintiff wishes to file a third amended complaint to properly add the allegations in the revised version of the proposed SAC, she may file an additional motion for leave to amend, to which Defendants are entitled to file a response.

### B. Defendants' Motion to Dismiss or for Summary Judgment

The Court thus turns to Defendants' Motion to Dismiss or for Summary Judgment with respect to the Amended Complaint, ECF No. 28. As described previously, although the Court will grant Plaintiff's Motion for Leave to file the proposed SAC, the Court may consider the existing dispositive motion as being addressed to the proposed SAC "[i]f some of the defects raised in the original motion remain in the new pleading." *Due Forni*, 2014 WL 5797785, at *2 (alteration in original) (quoting *Venable*, 2014 WL 2452705, at *5). As an initial matter, the Court agrees with Plaintiff that summary judgment is premature. As noted previously, Defendants have submitted six affidavits and the Note by Dr. Kraft in support of their Motion. *See* ECF Nos. 28-3, 28-5, 28-6, 28-7, 28-8, 28-9, 28-10. The Court need not examine each of the exhibits because the ambiguity about the circumstances of Plaintiff's diagnosis by Dr. Kraft and

the alleged backdating of his "Note" are sufficient to create an issue of material fact. More fundamentally, Defendants' Motion was filed on April 10, 2019, shortly after Plaintiff was reincarcerated and before she alleges that she was transferred to WCI. Accordingly, it concerns only allegations arising from her treatment at NCBI. Given that the Court has accepted the proposed SAC as the operative pleading, Defendants' exhibits addressing only NCBI claims cannot form an adequate record for summary judgment on the new pleading.

The Court will therefore evaluate the motion as a Motion to Dismiss and apply the relevant standard. To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). The Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must also "draw all reasonable inferences in favor of the plaintiff." *Id.* at 253 (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

The Court first considers issues concerning the identities of the Defendants and their potential for immunity from Plaintiff's claims. Defendant's Motion asserts that all of the Defendants were sued in both their individual and official capacities. ECF No. 28-1 at 1.

However, while Plaintiff's original *pro se* Complaint explicitly stated that each Defendant "is sued individually and in his or her official capacity," ECF No. 1 at 6, such a statement is not included in the Amended Complaint or the proposed SAC. "When a plaintiff fails to specifically allege capacity, 'the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity.'" *Brunson v. Howard Cty. Bd. of Educ.*, No. WDQ-10-3045, 2011 WL 2269557, at *3 (quoting *Biggs v. Meadows*, 66 F.3d 56, 59–60 (4th Cir. 1995)).

"Indications that the suit is brought against the official as an individual include the plaintiff's 'failure to allege that the defendant acted in accordance with a governmental policy or custom, or the lack of indicia of such a policy or custom on the face of the complaint'"; "a plaintiff's request for compensatory or punitive damages, since such relief is unavailable in official capacity suits"; "[a]nd, because qualified immunity is available only in an individual capacity suit, the defendant's assertion of that defense 'indicates that the defendant interpreted the plaintiff's action as being against him personally.'" *Id.* (quoting *Biggs*, 66 F.3d at 61). "The underlying inquiry is 'whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly' from the complaint." *Id.* (quoting *Biggs*, 66 F.3d at 61).

Here, despite the removal of the capacity statement from the Amended Complaint, it is clear that Plaintiff intends to sue the Defendants in their individual capacities. Most importantly, Plaintiff has sought both compensatory and punitive damages, plainly demonstrating that she seeks relief against the Defendants individually. However, the Amended Complaint and proposed SAC are also replete with allegations about DPSCS policies, most notably the alleged "freeze frame" policy, as well as an alleged policy of retaliation for seeking medical care, and the OPS.131.0001 gender dysphoria treatment protocol. This indicates that Plaintiff also seeks to

proceed with claims against Defendants in their official capacities. Considering this evidence alongside the explicit assertion in the original Complaint that Plaintiff intended to sue Defendants in both capacities, there are sufficient grounds to conclude that the subsequent pleadings do as well.

To the extent that Plaintiff seeks damages from Defendants in their official capacities, however, the Court lacks subject matter jurisdiction over such claims. "The Eleventh Amendment immunizes states from suits seeking money damages," *Adams v. Ferguson*, 884 F.3d 219, 224 (4th Cir. 2018) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)), and that immunity "also applies to 'judgment[s] against a public servant in his official capacity,'" *id.* (alteration in original) (citing *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985)); *see Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (holding that claims against parties entitled to sovereign immunity must be dismissed for lack of subject matter jurisdiction). While Eleventh Amendment immunity can be abrogated by Congress or waived by a state, neither exception applies here.[9] *See Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244, 248–49 (4th Cir. 2012).

Accordingly, any damages claims against Defendants in their official capacities must be dismissed. A third exception exists, however, for "suits for prospective injunctive relief against state officials acting in violation of federal law." *Id.* (citing *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004)). The proposed SAC's claim for a permanent injunction barring Defendants from retaliating against Plaintiff and interfering with her prescribed medical treatment may

---

[9] While Maryland by statute provides a limited waiver of the state's sovereign immunity for state law damages claims, that provision is not a waiver of the state's Eleventh Amendment immunity. *See Estate of Leyseth v. Maryland*, No. GJH-17-1362, 2018 WL 1225087, at *4 (D. Md. Mar. 6, 2018) (citing *Weller v. Dep't of Soc. Servs. for City of Balt.*, 901 F.2d 387, 397–98 (4th Cir. 1990)).

therefore proceed, regardless of whether it is asserted against Defendants in their individual or official capacities.

The Court thus turns to Defendants' remaining arguments. Defendants first argue, as they have in each stage of briefing, that there was no actionable denial of psychological or medical care and that Plaintiff's deliberate indifference claim must be dismissed. ECF No. 28-1 at 5–6. As noted previously, the Court has already found that Plaintiff has sufficiently alleged that claim and need not consider the issue further. Defendants also make a qualified immunity claim copied nearly verbatim from their Motion to Dismiss or for Summary Judgment with respect to the original Complaint. The Court also rejected that claim in its prior Memorandum Opinion and sees no grounds to revisit that determination now, particularly in light of the more extensive allegations presented by the Amended Complaint and the proposed SAC. *See* ECF No. 21 at 11 n.5 (holding that because Defendants failed to offer sufficient evidence to establish that they did not violate Plaintiff's Eighth Amendment rights, the Court had no basis to conclude that they were entitled to qualified immunity).

Defendants next make two related arguments. First, they claim generally that the supervisory Defendants have no liability under § 1983 because Plaintiff has insufficiently alleged that they personally participated in the alleged violations. As with the qualified immunity argument, this argument is also copied nearly verbatim from Defendants' prior Motion, and the Court has already rejected it with respect to all Defendants except for Moyer. ECF No. 21 at 12. Further, the Amended Complaint and the proposed SAC expand substantially on the original Complaint's allegations of the supervisory Defendants' knowledge of and involvement in the alleged violations, as well as the causal link between their inaction and the harm Plaintiff claims.

*See* ECF No. 44-1 ¶¶ 146, 175–81, 206–12, 214–15, 221–27. The Court will not dismiss any additional Defendants on this basis.

Defendants then argue that Plaintiff inadequately pleaded her § 1983 claim for failure to properly train and supervise. In general, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Bayard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)). To establish supervisory liability, a plaintiff must show

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices [ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* (alterations in original) (quoting *Shaw*, 13 F.3d at 799). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).

Plaintiff argues persuasively that she has alleged a pattern of widespread deliberate indifference to her medical needs throughout DPSCS and not an isolated incident at one institution. ECF No. 32 at 15. The Amended Complaint makes out extensive allegations that Plaintiff allegedly experienced a denial of care at WCI, where she has interacted with different staff supervised by the same officials overseeing NCBI. Further, as mentioned previously, Plaintiff has alleged a causal link between the supervisors' inaction, in spite of their actual or constructive knowledge of her medical needs, and the harm that she suffered from lacking access to her prescribed care and from being retaliated against for requesting it. *See, e.g.*, ECF No. 44-1

¶¶ 202, 212. The Court concludes that Plaintiff has adequately pleaded a claim of supervisory liability.

Defendants next assert that Plaintiff's suit was not filed within the applicable statute of limitations. "[T]o determine the timely filing of a § 1983 claim, courts borrow the statute of limitations from the most analogous state-law cause of action." *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014). "For § 1983 suits, that cause of action is a personal-injury suit." *Id.* (citing *Owens v. Okure*, 488 U.S. 235, 249–50 (1989)). "Maryland law affords plaintiffs three years to file a personal-injury action." *Id.* (citing Md. Code Ann., Cts. & Jud. Proc., § 5-101). "Although state law determines the applicable statute of limitations for § 1983 claims, federal law governs the date on which that limitations period begins to run," and generally provides that "'accrual occurs when the plaintiff has a complete and present cause of action' against a defendant—that is, when the plaintiff knows or has reason to know of his injury." *Id.* (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).

"A Section 1983 claim of deliberate indifference ordinarily accrues when a plaintiff becomes aware or has reason to know of the harm inflicted." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999)). "However, when a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff under certain circumstances may allege a 'continuing violation' for which the statute of limitations runs anew with each violation." *Id.* (quoting *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166–67 (4th Cir. 1991)). Applying these principles, the Fourth Circuit in *DePaola v. Clarke* held that "a prisoner may allege a continuing violation under Section 1983 by identifying a series of acts or omissions that demonstrate deliberate indifference to a serious, ongoing medical need." *Id.* at 487. "The statute of limitations does not begin to run on such a claim for a

continuing violation of a prisoner's Eighth Amendment rights until the date, if any, on which adequate treatment was provided." *Id.* (citing *Lavellee v. Listi*, 611 F.2d 1129, 1132 (5th Cir. 1980)). "A plaintiff's claim of a continuing violation may extend back to the time at which the prison officials first learned of the serious medical need and unreasonably failed to act." *Id.* (citing *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001)).

"Accordingly, to assert a Section 1983 claim for deliberate indifference under the 'continuing violation' doctrine, a plaintiff must (1) identify a series of acts or omissions that demonstrate deliberate indifference to his serious medical need(s); and (2) place one or more of these acts or omissions within the applicable statute of limitations for personal injury." *Id.* (citing *Shomo v. City of N.Y.*, 579 F.3d 176, 172 (2d Cir. 2009)). Plaintiff has done so here. As the Court noted in the prior Memorandum Opinion, Plaintiff's original Complaint, filed on April 3, 2017, alleged that Defendants were aware of her possible "sex identity issues" as early as October 15, 2015, and that Plaintiff alerted Defendants to her ongoing medical needs and sought and struggled to obtain care numerous times over the next fifteen months. *See* ECF No. 21 at 9–10. The most recent incident alleged was in December 2016, when Plaintiff sent a letter to Defendants describing her prior diagnosis of gender dysphoria, the obstacles she had encountered to receiving care at NCBI, and her recent history of self-harm and suicide attempts. *See id.* at 10 (citing ECF No. 1-2 at 3–4). As the Court noted, Defendant Nero acknowledged the letter and sent Plaintiff a response. *Id.* (citing ECF No. 1-2 at 2). This pattern of activity, which the Court has already found plausibly alleged a deliberate indifference claim, included acts within the applicable three-year statute of limitations, rendering Plaintiff's Eighth Amendment claim timely under the rule set forth in *DePaola*.[10]

---

[10] Defendants' Motion does not raise the timeliness of the other claims in the Amended Complaint. "Generally, a defendant waives the statute of limitations by failing to raise that defense in its answer or a pre-answer motion."

Defendants finally argue that they are entitled to dismissal because "[a] Plaintiff seeking damages from the State is statutorily required to comply" with the notice requirements of the Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Gov't §§ 12-101 *et seq.* ECF No. 28-1 at 11 (citing Md. Code Ann., State Gov't § 12-106). Under the MTCA, "[a] plaintiff may assert a common law or state constitutional tort claim against the State of Maryland or one of its agencies only if he first complies with the notice requirements of the [statute], which provides a limited waiver of state sovereign immunity." *Taylor v. Somerset Cty. Comm'rs*, No. RDB-16-0338, 2016 WL 3906641, at *5 (D. Md. July 19, 2016) (citation omitted).

Because the Court has already dismissed Plaintiff's claims against Defendants in their official capacities and only individual capacity claims remain, Plaintiff no longer has any claims for which she is "seeking damages from the State," in Defendants' words. ECF No. 28-1 at 11. And the MTCA's notice requirements do not apply to claims against individual state employees. *See Taylor*, 2016 WL 3906641, at *5 (citing *Sykes v. Wicomico Cty.*, No. CCB-05-2846, 2007 WL 1073607, at *8 (D. Md. Mar. 30, 2007)). The statute's notice provisions therefore do not bear on Plaintiff's remaining claims. Because Defendants have not asserted any other grounds for dismissal of those claims under the MTCA, Plaintiff's claims may proceed.

### C. Plaintiff's Motion for Leave to File Surreply

The Court finally turns to Plaintiffs' Motion for Leave to File a Surreply. ECF No. 43. As described previously, Plaintiff asserts that there are new arguments in Defendants' Reply in support of their Motion to Dismiss or for Summary Judgment that are beyond the scope of the Motion. *Id.* at 2, 8. Plaintiff therefore asks the Court to disregard those arguments or to allow

---

*Goyal v. Thermage, Inc.*, No. WDQ-08-0020, 2010 WL 2651185, at *2 (D. Md. July 1, 2010) (citing *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653–54 (4th Cir. 2006)). Defendants may raise the timeliness of any of Plaintiff's claims aside from the § 1983 deliberate indifference claim in an answer.

Plaintiff to file a surreply to respond to them. *Id.* at 8–9. In the initial memorandum supporting their Motion, Defendants made six arguments which the Court has now addressed: that Plaintiff fails to state a deliberate indifference claim under the Eighth Amendment; that the supervisory Defendants cannot be liable under § 1983 unless they personally participated in the acts alleged; that Plaintiff fails to state a claim of failure to train and supervise; that Defendants are entitled to qualified immunity; that Plaintiff's claims are untimely; and that Plaintiff has failed to comply with the MTCA's notice rules. ECF No. 28-1.

Defendants' Reply brief, however, makes several wholly new arguments, including that Plaintiff fails to state a claim of intentional infliction of emotional distress; that Defendants are entitled to "public official immunity" under Maryland law; that Defendants and the State of Maryland are immune from Plaintiff's claims under the Eleventh Amendment; and that Plaintiff is not entitled to compensatory damages because she has inadequately alleged physical harm as a result of Defendants' actions.[11] ECF No. 42. None of these arguments were raised, or even alluded to, in the opening brief. "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citing *United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006)).

Plaintiff cites this rule in asking the Court to disregard the new arguments or alternatively to grant Plaintiff leave to file a surreply. ECF No. 43 at 8. The Court has determined that applying the ordinary rule is appropriate and accordingly has declined to consider the unequivocally new arguments in Defendants' Reply, with the exception of the jurisdictional

---

[11] Defendants also restated arguments from their opening brief, which the Court has considered.

issue of Eleventh Amendment immunity. Therefore, because a surreply is unnecessary, the Court will deny Plaintiff's Motion for Leave.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, ECF No. 28, is denied, though all of Plaintiff's claims against Defendants in their official capacities are dismissed. Plaintiff's Motion for Leave to File a Surreply, ECF No. 43, is also denied, but Plaintiff's Motion for Leave to File Second Amended Complaint, ECF No. 44, is granted. The proposed Second Amended Complaint, ECF No. 44-1, is the operative pleading. Defendants shall file an answer within 14 days. A separate Order shall issue.

Date: <u>March    23, 2020</u>                    <u>  /s/                              </u>
                                              GEORGE J. HAZEL
                                              United States District Judge