## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMBER MAREE CANTER, (F/K/A CHARLES CANTER), | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| J. MICHAEL ZEIGLER | * |
| Acting Secretary | * |
| Department of Public Safety | * |
| and Correctional Services | * |
| 7667 Reisterstown Road | * |
| Baltimore, Maryland  21215 | * |
| | * |
| and | * |
| | * |
| RANDALL S. NERO, M.D. | * |
| Department of Public Safety | * |
| and Correctional Services | * Case No. GJH-17-908 |
| 7667 Reisterstown Road, No. 309 | * |
| Baltimore, Maryland  21215 | * |
| | * |
| and | * |
| | * |
| SHARON BAUCOM, M.D. | * |
| Department of Public Safety | * |
| and Correctional Services | * |
| 7667 Reisterstown Road, No. 309 | * |
| Baltimore, Maryland  21215 | * |
| | * |
| and | * |
| | * |
| MAHBOOB ASHRAF, M.D. | * |
| c/o Ozborne Correctional Institution | * |
| 335 Bilton Road | * |
| Summers, Connecticut  060671 | * |
| | * |
| and | * |
| | * |
| | * |
| | * |
| | * |

HARRY MURPHY, M.D.                          *
Department of Public Safety                 *
 and Correctional Services                  *
7667 Reisterstown Road, No. 309             *
Baltimore, Maryland  21215                  *
                                            *
and                                         *
                                            *
BRUCE A. LILLER, MS, LCPC                   *
North Branch Correctional Institution       *
14100 McMullen Highway, S.W.                *
Cumberland, Maryland  21052                 *
                                            *
and                                         *
                                            *
LAUREN BEITZEL, M.D.                         *
North Branch Correctional Institution       *
14100 McMullen Highway, S.W.                *
Cumberland, Maryland  21052                 *
                                            *
and                                         *
                                            *
                                            *
JEFF NINES                                  *
Assistant Warden                            *
North Branch Correctional Institution       *
14100 McMullen Highway, S.W.                *
Cumberland, Maryland  21052                 *
                                            *
and                                         *
                                            *
RICHARD J. GRAHAM, JR.                      *
Warden                                      *
Western Correctional Institution            *
13800 McMullen Highway, S.W.                *
Cumberland, Maryland  21052                 *
                                            *
and                                         *
                                            *
RONALD WEBER                                *
Acting Assistant Warden                     *
Western Correctional Institution            *
13800 McMullen Highway, S.W.                *
Cumberland, Maryland  21052                 *
                                            *
and                                         *

|  | * |
|--|---|
|  | * |
| BRENDA REESE, R.N., BC, CRNI | * |
| Western Correctional Institution | * |
| 13800 McMullen Highway, S.W. | * |
| Cumberland, Maryland  21502 | * |
|  | * |
| and | * |
|  | * |
| CASE MANAGER BITTINGER | * |
| Western Correctional Institution | * |
| 13800 McMullen Highway, S.W. | * |
| Cumberland, Maryland 21502 | * |
|  | * |
| and | * |
|  | * |
| CORRECTIONAL OFFICER II FAUST | * |
| Western Correctional Institution | * |
| 13800 McMullen Highway, S.W. | * |
| Cumberland, Maryland  21052 | * |
|  | * |
| and | * |
|  | * |
| CORRECTIONAL OFFICER THOMPSON | * |
| Western Correctional Institution | * |
| 13800 McMullen Highway, S.W. | * |
| Cumberland, Maryland  21502 | * |
|  | * |
| and | * |
|  | * |
| CORRECTIONAL OFFICER BARNES | * |
| Western Correctional Institution | * |
| 13800 McMullen Highway, S.W. | * |
| Cumberland, Maryland 21502 | * |
|  | * |
| Defendants. | * |

## SECOND AMENDED COMPLAINT

Plaintiff Amber Maree Canter, by her undersigned attorneys, sues Defendants J. Michael

Zeigler, Acting Secretary of the Department of Public Safety and Correctional Services, et al., in

support thereof, says:

## PRELIMINARY STATEMENT

1.      Plaintiff Amber Maree Canter ("Plaintiff" or "Ms. Canter") is a transgender woman[1] who, during the relevant period, was and is in the custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS"), housed at North Branch Correctional Facility ("North Branch") and Western Correctional Institution ("WCI"), facilities for male inmates, in Cumberland, Maryland.  She is currently housed at the WCI.  Defendants are individuals who, for the duration of Ms. Canter's incarceration, had and have authority and responsibility for her medical treatment.

2.      As set forth below, despite knowing that Ms. Canter has gender dysphoria, a serious medical condition that causes severe physiological suffering and can lead to physical injury when not properly treated, Defendants refused to provide Ms. Canter with medically necessary care while she was within their custody.

3.      On February 15, 2017, Ms. Canter filed a Petition for Change of Name in the Baltimore City Circuit Court, seeking to change her name from the traditionally male name given to her at birth to her current legal name, Amber Maree Canter.[2]  [D.E. 1-4 174 out of 239 Compl.]

4.      Prior to incarceration, Ms. Canter was diagnosed with gender dysphoria by healthcare providers at Maryland General Hospital and began taking hormones prescribed by a licensed medical provider.

---

[1]   In keeping with Ms. Canter's gender identity, modern judicial practice, and accepted medical protocol, this Complaint uses female pronouns to refer to her.

[2]   On May 8, 2017, Ms. Canter received an order from Circuit Court for the Baltimore City Circuit Court granting her name change petition.  On August 4, 2017, the Circuit Court for Baltimore City entered an amended commitment order recognizing the name change. Nevertheless, the DPSCS personnel insist on referring to Ms. Canter by her birth name.

5.      Upon incarceration, DPSCS and its medical professionals refused to recognize Ms. Canter's diagnosis.

6.      Despite numerous requests to Defendants, mental health personnel refused to evaluate Ms. Canter for gender dysphoria, and refused to provide any hormonal therapy, citing a policy or custom of providing hormone therapy only to those transgender inmates who are receiving it prior to incarceration.

7.      This type of "freeze-frame" policy violates the medically accepted standard of care for treating gender dysphoria; similar state and federal policies have been held unconstitutional by federal courts as a violation of the Eight Amendment of the United States constitution.

8.      The DPSCS Medical Evaluations Manual provides that "DPSCS will provide medical services and render hormonal support for Transgender detainees/intimates with documentation of previous evaluation and/or enrollment in a certified Transgender Program.  This directive recognizes that it can be medically necessary treatment for gender dysphoria. Nonetheless, DPSCS unreasonably refused to provide this medically necessary treatment to Ms. Canter due to DPSCS's unconstitutional "freeze-frame" policy.

9.      In addition to denying Ms. Canter hormone therapy on account of the freeze frame policy, Defendants denied Ms. Canter even the opportunity to be evaluated by a person with experience treating gender dysphoria and similarly the ability to receive psychotherapy from a medical professional with expertise in treating such patients.  These denials in fact unjustly prohibited Ms. Canter from her right to receive hormonal therapy in line with use prior to being incarcerated even in spite of the unconstitutional "freeze-frame" policy. DPSCS's Medical Evaluation Manual provides:

> Inmates who self-proclaim transgender and who have self-proscribed hormonal therapy without medical or psychological verification may be maintained on hormones on a case-

Case 8:17-cv-00008-GJH Document 44-1 Filed 10/04/19 Page 6 of 51

by-case basis but will require the following: (i) A referral for complete mental health evaluation by a consultant who specializes in or is familiar with gender dysphoric patients. (ii). Routine follow up of liver, breast, and biochemical markers, serum prolactin, etc. as a routine part of ongoing health care needs.

10.     Defendants do not deny that Ms. Canter has gender dysphoria requiring treatment. Rather, they have deliberately refused to address Ms. Canter's serious medical needs and denied her care pursuant to an unconstitutional policy or custom that ignores the recommendations of mental health professionals.

11.     Through their deliberate indifference, Defendants caused Ms. Canter profound pain and suffering for which she seeks relief.

12.     Ms. Canter has fully exhausted her administrative remedies to no avail.

13.     Ms. Canter brings this action pursuant to 42 U.S.C. § 1983, and the common law to seek redress for Defendants' failure to train and supervise which led to certain Defendants' deliberate indifference to her serious medical needs, and intentional infliction of emotional distress while in their custody, which constituted cruel and unusual punishment under the Eight Amendment to the United States Constitution, made applicable to the State through the Fourth Amendment.

### JURISDICTION AND VENUE

14.     Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution

15.     This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the relevant events occurred within the district.

17.     This Court has personal jurisdiction over each and every defendant because, upon information and belief, all Defendants were either residents of Maryland, were employed in

Maryland, or conducted business in Maryland, and were all acting under color of state law during all relevant times.

## PARTIES

18.     Plaintiff Amber Maree Canter ("Plaintiff" or "Ms. Canter"), is a transgender woman, diagnosed with gender dysphoria, who is a prisoner of the State of Maryland in the custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS").  As a prisoner, Ms. Canter was previously housed at North Branch and is now housed at WCI.

19.     Upon information and belief, Defendant J. Michael Zeigler ("Zeigler") was at relevant times the Acting Secretary of the Department of Public Safety and Correctional Services. In this role, he is legally responsible for the overall operations of DPSCS in each institution under his jurisdiction in Maryland, including WCI.

20.     Upon information and belief, Defendant Dr. Randall S. Nero ("Nero"), was at relevant times the Director of Mental Health at DPSCS.  In this role, he is legally responsible for the overall health operations of DPSCS and each institution under his jurisdiction in Maryland, including North Branch.

21.     Upon information and belief, Defendant Dr. Sharon Baucom ("Baucom"), was at all relevant times Director of Wexford Medical Services of DPSCS.  In this role, she is responsible for the overall medical services and its operations of MDCOS and its contracts with each institution under her jurisdiction in Maryland, including North Branch.

22.     Upon information and belief, Defendant Dr. Harry Murphy ("Murphy"), is the Western Region Mental Health Director of DPSCS.  In this role, he is responsible for the overall medical operations of DPSCS for the institutions in the Western Region of Maryland, including North Branch.

23.     Upon information and belief, Defendant Dr. Mahmood Ashraf ("Ashraf"), was the North Branch main medical provider at all relevant times.  In this role, he was responsible for the treatment and clinical services for inmates housed at North Branch.

24.     Upon information and belief, Defendant Bruce A. Liller ("Liller") was at all times relevant a Mental Health Program Manager at North Branch.  In this role, he oversaw the operations of North Branch's psychology department.

25.     Upon information and belief, Defendant Lauren Beitzel ("Beitzel") was at all relevant times a Mental Health Professional Counselor-Advanced (SMO) Housing Unit One at North Branch.  Beitzel is a LCPC, and her role is to provide mental health services to inmates at North Branch.

26.     Upon information and belief, Defendant Jeffrey Nines ("Nines") is the assistant warden of North Branch.  In this role, he is responsible for the operations, programs, and services of North Branch.  Further, as assistant warden Defendant Nines is responsible for the safety and welfare of all inmates housed at North Branch.

27.     Upon information and belief, Defendant Richard J. Graham, Jr. ("Graham") is the warden of WCI.  In this role, he is responsible for the operations, programs and services of WCI.  Further he is responsible for the safety and welfare of all inmates housed at WCI and is responsible for maintaining adherence by correctional and medical personnel with the various policies, procedures and regulations of the DPSCS.

28.     Upon information and belief, Defendant Ronald Weber ("Weber") is the Acting Assistant Warden of WCI.  In this role, he is responsible for the operations, programs and services at WCI.  Further, as assistant warden, Weber is responsible for the safety and welfare of all inmates

housed at WCI and with maintaining compliance by correctional and medical personnel with the policies, procedures and regulations of the DPSCS and applicable law.

29.     Upon information and belief, Defendant Brenda Reese is the medical director for WCI.  In this role, she is responsible for the treatment of clinical services for inmates housed at WCI.

30.     On information and belief, Case Manager Bittinger[3] is an individual employed by DPSCS at WCI as a case manager.  In this role, Defendant Bittinger is responsible for making recommendations regarding inmate classification, housing and work assignments.

31.     On information and belief, Defendant Correctional Officer II Faust is an individual employed by DPSCS and assigned to WCI.  In this role, Defendant Faust is responsible for the safety and welfare of inmates housed at WCI and is required by DPSCS to comply at all times with the policies and procedures and regulations at DPSCS and applicable law.

32.     On information and belief, Correctional Officer Thompson ("Thompson") is an individual employed by DPSCS and assigned to WCI.  In this role, he is responsible for the safety and welfare of inmates housed at WCI and is required by DPSCS to comply at all times with the policies and procedures and regulations at DPSCS and applicable law.

33.     On information and belief, Correctional Officer Barnes ("Barnes") is an individual employed by DPSCS and assigned to WCI.  In this role, he is responsible for the safety and welfare of inmates housed at WCI and is required by DPSCS to comply at all times with the policies and procedures and regulations at DPSCS and applicable law.

---

[3]     Employees of DPSCS working in prisons often identify themselves to inmates only by last name.

34.     On information and belief, Correctional Lieutenant Forney ("Forney") is an individual employed by DPSCS and assigned to WCI.  Among Lieutenant's Forney's responsibilities is to investigate threats of inmate on inmate violence and to approve a transfer of inmates to administrative segregation or protective custody.

## FACTS

### *Background on Gender Dysphoria and Its Medical Treatment and Standards of Care*

35.     A person's gender identity refers to that person's internal sense of belonging to a particular gender.  It is a deeply felt, core component of a person's identity and the most important determinant of a person's sex.

36.     Emerging research points to the influence of biological factors, most notably the role of sex differentiation in the brain, in gender identity development.

37.     Everyone has a gender identity.  For most people, the sex they were assigned at birth matches their gender identity.  For transgender people like Ms. Canter, the sex they were assigned at birth does not accurately reflect their gender identity.

38.     There is medical consensus that gender identity cannot be changed and attempts to change a person's gender identity are both futile and unethical.

39.     Transgender people may experience discomfort or distress caused by the discrepancy between gender identity and sex assigned at birth.  Where this distress reaches a clinical level, it may support a formal diagnosis of gender dysphoria.

40.     Gender dysphoria is a condition recognized by the American Psychiatric Association's Diagnostic and Statistical Manual Disorders, Fifth ed. (2013) ("DSM-V), and by the other leading and medical health professional groups, including the American Medical Associations and the American Psychological Association.

41.     As set forth in the DSM-V, the diagnostic criteria for gender dysphoria are:

(a) A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two of the following:

(i) A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

(ii) A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

(iii) A strong desire for primary and/or secondary sex characteristics of the other gender.

(iv) A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

(v) A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

(vi) A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

(b)     The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

42.     There is medical consensus that gender dysphoria is a serious medical condition that if not properly treated is known to cause clinical distress; debilitating depression, anxiety, and mental impairment; the impulse to engage in self-surgery and self-harm; and even suicidal thoughts or acts.

43.     Incarcerated transgender women like Ms. Canter are at a particularly high risk of engaging in self-harm, including attempts at self-surgery, when treatment is withheld.

44.     Gender dysphoria often intensifies with time.  The longer an individual goes without treatment, the greater the risk of severe harms to the individual's physical and psychological health.

45.     The medically recognized protocols for the treatment of gender dysphoria are set forth in the World Professional Association for Transgender Health ("WPATH") Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People ("Standards of Care").

46.     The American Psychological Association, the American Medical Association, and the Endocrine Society have recognized the Standards of Care as the authoritative articulation of professional consensus on the treatment of gender dysphoria.  Courts that have considered the issue have also consistently relied on the Standards of Care.

47.     The Standards of Care provide for the following treatments, some or all of which will be required, depending on the individual medical needs of the patient:

Case 8:17-cv-00008-GJH   Document 41   Filed 03/28/20   Page 13 of 51

(a)     Changes in gender expression and role (which may involve living part time or fulltime in another gender role, consistent with one's gender identity);

(b)     Hormone therapy to feminize or masculinize the body in order to reduce the distress caused by the discordance between one's gender identity and sex assigned at birth;

(c)     Surgery to change primary and/or secondary sex characteristics; and

(d)     Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

48.     A critical component of the treatment for gender dysphoria as prescribed by the Standards of Care is a process often referred to as the "social role transition," which requires living in accordance's with one's gender identity through changes in gender expression and role, including dressing, grooming, and otherwise outwardly expressing oneself consistently with one's gender.

49.     Psychotherapy or counseling can provide support and affirmation to individuals diagnosed with gender dysphoria, but is not a substitute for treatments such as hormone therapy or social role transition where such treatments are medically necessary. Likewise, the use of antidepressants and psychotropic medications are inadequate treatments for gender dysphoria where treatments such as hormone therapy or social role transition are medically necessary.

50.     Attempting to treat a person who needs hormone therapy, social role transition, or other forms of medically necessary treatment for gender dysphoria with mental health counseling

alone, or in combination with psychotropic drugs, is a dangerous deviation from the Standards of Care that puts the person at risk of physical injury, decompensation, and death.

51.     Likewise, attempting to "cure" a person of gender dysphoria by attempting to force them to disregard their gender identity and live as their assigned gender is dangerous and unethical and puts them at substantial risk of serious harm.

52.     The Standards of Care apply with equal force to persons who are incarcerated and persons who are not incarcerated, and have been endorsed by the National Commission on Correctional Healthcare and the U.S. Department of Justice National Institute of Corrections as the medically accepted standard for the treatment of inmates with gender dysphoria.

53.     The Standards of Care state that a "freeze-frame" approach to the provision of hormone therapy to people who are incarcerated is not considered appropriate care and warn that "the consequences of . . . lack of initiation of hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality."

54.     The National Commission on Correctional Healthcare ("NCCHC") recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the Standards of Care. The NCCHC also explains that "policies that make treatments available only to those who received them prior to incarceration or that limit transition and/or maintenance are inappropriate and out of step with medical standards and should be avoided."

55.     The Federal Bureau of Prisons and many state and local corrections agencies administer hormone therapy to prisoners in their custody with gender dysphoria, including prisoners who did not receive such therapy at the time of incarceration.

56.     Ms. Canter was diagnosed with gender dysphoria by the inpatient psychology unit at the Maryland General Hospital.  The mental health providers at Maryland General Hospital who evaluated and diagnosed Ms. Canter with gender dysphoria recognized that treatment for gender dysphoria should follow the Standards of Care and have recommended hormone therapy for Ms. Canter's gender dysphoria.

57.     DPSCS has a protocol for the evaluation and treatment for inmates with gender identity problems:  OPS.131.0001 Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria.  [ECF 17-3]

58.     OPS.131.0001.03(A) provides that, *inter alia*¸ the Department shall diagnose, treat, and manage inmates diagnosed with Gender Dysphoria in a manner consistent with appropriate treatment, custody, and security standards in accordance with applicable law and policy.

59.     OPS.131.0001.04(B)(6) provides that "'Gender Dysphoria' means a marked incompatibility between an individual's experienced or expressed gender and assigned gender causing significant distress or impairment in important areas of functioning, such as, school, work social, and other similar areas.  [ECF 17-3].

60.     OPS.131.0001.05 describes the department's responsibility and procedures.

61.     Included in these responsibilities and procedures is § .05(B)(1), which provides that "If at any time an inmate self-identifies criteria for Gender Dysphoria or is referred by medical staff as possibly having Gender Dysphoria, a Mental Health Clinician assigned to the inmate shall evaluate, based upon a face-to-face evaluation and a review of available inmate medical and mental health history, to determine if the inmate meets the criteria for a provisional diagnosis of Gender Dysphoria."

62.     OPS.131.000.05(C)(5)(b) states that "[i]f the Gender Dysphoric diagnosis is: "Referred to a Gender Dysphoria Consultant and rejected, the Regional Treatment Team shall refer the case to the Regional Director of Mental Health to arrange for appropriate medical and mental health treatment options."

63.     Section .05(F)(1)(a) provides that "[a]t the time of intake in a Department correctional facility, if an inmate is currently under hormonal therapy as part of an established regimen for Gender Dysphoria and the contracted medical services provider verifies the treatment and determines that the regimen is not contraindicated, the contracted medical services provider shall continue the hormonal therapy . . ."

64.     Section .05(F)(1)(b) provides that "[a]t the time of intake in a Department correctional facility, if an inmate is currently under hormonal therapy as part of an established regimen for Gender Dysphoria and the contracted medical services provider verifies the treatment and determines that the regimen is contraindicated, the contracted medical provider shall:  record the finding in the inmate's Electronic Health Record, explain the rationale for not continuing the hormonal therapy to the inmate, refer the inmate to a Mental Health Clinician, and if deemed appropriate, refer the inmate to a Clinical Pharmacist."

### *Ms. Canter's Gender Dysphoria*

65.     Ms. Canter is a transgender woman.

66.     Although Ms. Canter was assigned male at birth, her identity as a woman is just as valid as that of a women assigned female at birth.

67.     Ms. Canter can remember that, since the age of five (5), she has identified as a female.  Since that age, Ms. Canter has felt different and uncomfortable in her skin, and trapped in the wrong body.  She recalls feeling most comfortable when wearing what is traditionally referred to as female clothing and wearing makeup.

68.     After decades of struggling with her gender identity, Ms. Canter sought medical support for her gender dysphoria.

69.     In 2013, Ms. Canter was diagnosed at Maryland General Hospital with what at the time was termed gender identity disorder, but is now known as gender dysphoria.

70.     In or around that time Ms. Canter also began hormone therapy. Ms. Canter procured her hormonal medication on the black market because her insurance would not cover them.  In particular, Ms. Canter took the following medications: premarin injections and tablets, delesquin, and spironalactome.

71.     In April 2013, Ms. Canter was incarcerated.

72.     While incarcerated in North Branch, Ms. Canter repeatedly sought treatment from Defendants Nero, Baucom, Asraf, Murphy, Liller and Beitzel for the depression and anxiety caused by her gender dysphoria.

73.     Ms. Canter arrived at North Branch as someone who had already been diagnosed with gender dysphoria and was already seeking professional treatment -- prior to her incarceration -- by:

     (a)     Maryland General Hospital in Baltimore;

     (b)     Belvedere Assisted Living;

     (c)     Dr. Collin Ottey in Candover;

     (d)     Sheppard Pratt;

     (e)     Tutties Place Group Home;

     (f)     John's Hopkins Hospital; and

     (g)     Baltimore Crisis Response Unit.

74. These various mental health providers diagnosed Ms. Canter with gender identity disorder, the term that has since been replaced by the term gender dysphoria. These mental health providers have consistently recognized Ms. Canter as a woman.

75. Ms. Canter advised medical personnel at North Branch, including Defendants Ashraf, Liller and Beitzel, of her diagnosis and of the identity of the healthcare provides who would have records of that diagnosis.

76. DPSCS has implemented a so-called "Freeze Frame Policy" with regard to transgender inmates. Pursuant to that policy, DPSCS "freezes" transgender inmates in their status as of the beginning of their incarceration and refuses to provide inmates with hormonal treatments unless and until they have a diagnosis of gender dysphoria.

77. In the case of Ms. Canter, Defendants Nero, Baucom, Ashraf, Murphy, Liller and Beitzel, DPSCS, North Branch and, later, WCI refused to either recognize her pre-incarceration diagnosis of gender dysphoria or provide her with the necessary psychological evaluation during incarceration to obtain the diagnosis.

78. Upon incarceration, Ms. Canter immediately requested continuation of her hormone therapy regimen. Her request was denied.

79. Upon incarceration, Ms. Canter reached out to the various medical care centers providing her mental and hormonal services and consented to their providing to provide the records to DPSCS.

80. Defendants Nero, Baucom, Ashraf, Murphy, Liller and Beitzel failed to or failed to attempt to retrieve these records and further refused to evaluate her for medical diagnosis and treatment while incarcerated.

81.     While incarcerated, Ms. Canter experienced severe distress and serious impairments in her daily life and continues to experience this distress due to gender dysphoria. She experienced and continues to experience discomfort with her body and experienced and continues to experience psychological and physical symptoms due to Defendants' refusal to accept her previous diagnosis or diagnose her for gender dysphoria, and she has exhibited physical manifestations due to this refusal, including panic attacks, anxiety, racing heartbeat, shortness of breath, sleep disturbance, lack of appetite, suicidal thoughts, attempts at suicide, and attempts of castration.

82.     Defendants' refusal to diagnose and treat Ms. Canter's gender dysphoria caused her to -- while incarcerated -- attempt suicide on eighteen (18) separate occasions, to attempt to starve herself, and attempt to castrate herself.

83.     Under the Standards of Care, hormone therapy and social role transition were medically necessary treatments for Ms. Canter -- which Defendants denied.

***Defendants' Denial of Medically Necessary Treatment for Ms. Canter's Gender Dysphoria***

84.     On April 30, 2015, Ms. Canter was sent to the Western Region Medical Center because of lumps and leakage that developed on Ms. Canter's breasts while Ms. Canter was incarcerated.

85.     Dr. James Benjamin, of the Western Region Medical Center, ordered a mammogram and ultra sound test and determined that lumps and leakage from Ms. Canter's breasts were caused by estrogen withdrawal.

> (a)     Ms. Canter's estrogen withdrawal was due to her inability to receive proper treatment for her gender dysphoria, i.e. she was unable to continue the hormone therapy regimen she was placed on prior to her incarceration.

(b)     During this visit, Dr. Benjamin also diagnosed Ms. Canter with gynecomastia.

86.     Consistent with DPSCS policy, Ms. Canter submitted requests seeking initial evaluations for gender dysphoria and for treatment of her gynecomastia.

87.     Records establish that, as early as October 15, 2015, Defendants were aware that Ms. Canter was having "sex identity issues," Ex. 1 (Consultation Report by Liberatus DeRosa, MD) [currently ECF No. 1-1 at 14], and that she had been on "estrogen in [the] past as part of his sexual identity crisis" and "apparently still desiring to make a change." Ex. 2 (Chronic Care Visit) [currently ECF 1-1 at 16].

88.     A report concerning Ms. Canter's December 4, 2015 provider visit noted that Ms. Canter "was using estrogen 'buying it off the streets' while contemplating transgender conflicts." Ex. 3 (Dec. 4, 2015 Provider Visit) [currently ECF No. 1-1 at 21].

89.     On March 11, 2016, Ms. Canter authorized release of all information relating to her gender dysphoria to the DPSCS. [currently ECF No. 1-1 at 65].

90.     Despite knowledge of Ms. Canter's condition and ongoing suffering, Defendants refused to provide an evaluation for Ms. Canter's gender dysphoria and denied her treatment for gynecomastia because they refused to accept her diagnosis of gender dysphoria.

91.     On May 10, 2016, May 21, 2016 and May 22, 2016, Ms. Canter requested to be evaluated by gender specialist so hormone therapy could be re-established.

92.     On June 6, 2016 Ms. Canter filed a request for administrative remedy requesting to be evaluated by a gender specialist so hormone therapy could be re-established.  [ECF 1-4]

93.     On June 9, 2016, she requested to see a doctor so that she could be evaluated and sent to a hormone/gender specialist.

94.     On June 10, 2016, she requested to see a gender specialist.

95.     On June 13, 2016, she requested to be sent to a "Hormone/Gender Specialist for diagnosis and treatment" so she could be "placed back on [her] hormone therapy."

96.     On June 25, 2016, she requested a status update on her request to see a gender specialist.

97.     On August 5, 2016, she requested a status update on her request for treatment of her transsexualism and stated she would like to be castrated or get hormone therapy.

98.     On August 16, 2016 Ms. Canter filed a request for administrative remedy seeking to have her mental health records transfer to DPSCS.  [ECF 1-4]

99.     On August 24, 2016, Ms. Canter visited the North Branch medical office on a sickcall to discuss her request for an evaluation for gender dysphoria and request treatment.  Her request was denied.

100.    On September 2, 2016, Ms. Canter met Defendant Murphy concerning her request for an evaluation for her gender dysphoria.  Defendant Murphy refused to refer Ms. Canter to the appropriate mental health specialist who would perform such an evaluation.

101.    Ms. Canter continued to follow up with requests for an evaluation and treatment for her gender dysphoria on:

          (a)     September 13, 2016;

          (b)     September 22, 2016;

          (c)     October 12, 2016;

          (d)     October 20, 2016;

          (e)     December 25, 2016;

          (f)     January 31, 2017;

(g)     February 7, 2017;

(h)     February 15, 2017;

(i)     February 28, 2017; and

(j)     March 11, 2017.

102.    In addition to these requests, Ms. Canter had numerous sickcall interviews with nurses, discussing her gender dysphoria, gynecomastia, desire for castration, and to again restate her need to see a mental health specialist who could evaluate her gender dysphoria.

103.    While at North Branch, Ms. Canter visited sickcall with nurses on:

(a)     September 15, 2016;

(b)     October 5, 2016;

(c)     October 22, 2016

(d)     November 3, 2016;

(e)     January 10, 2017;

(f)     January 23, 2017;

(g)     February 3, 2017;

(h)     February 9, 2017;

(i)     March 15, 2017.

104.    On information and belief, the various nurses made records of Ms. Canter's visits and told Defendants Ashraf, Murphy, Liller and Beitzel of Ms. Canter's visits and medical issues.

105.    In addition to Ms. Canter's numerous sickcall visits and requests for evaluations, Ms. Canter also sough intervention by making use of DPSCS's administrative remedies protocols on:

       (a)      June 6, 2016;

       (b)      July 2, 2016;

       (c)      August 16, 2016;

       (d)      September 27, 2016

       (e)      October 4, 2016;

       (f)      November 10, 2016.

106.    Upon her numerous and repeated requests for treatment being denied, Ms. Canter sent a letter to the assistant warden, Defendant Hines, on October 6, 2016. Ms. Canter discussed her conditions as a transgender female who is being denied hormone therapy and proper treatment pursuant to the unconstitutional freeze frame policy. In this letter, Ms. Canter specifically requested the following:  (1) an evaluation by professionals to determine what treatment will be necessary to assist her in her "crisis"; (2) an evaluation for gender reassignment surgery; (3) hormone replacement therapy; (4) certain feminine items from commissary; and (5) a "revamp" of the freeze frame policy.

107.    On October 13, 2016, Ms. Canter was sent back to the Western Region Medical Center as a follow up on her gynecomastia.  The medical staff ran an x-ray on her chest.

108.    On October 20, 2016 during a sickcall, Ms. Canter discussed her gynecomastia, requested a bra, and asked to see the breast doctor again due to growing lumps.  During this visit, Ms. Canter also discussed her depression and attempt to self-castrate.

109.    Ms. Canter also had numerous visits with Defendant Beitzel, the mental health counselor, to discuss her depression and suicidal thoughts regarding her inability to receive necessary help required for her gender dysphoria.   Defendant Beitzel notified Ms. Canter that Defendant Beitzel had been instructed to not give a diagnosis of gender dysphoria to Ms. Canter because Ms. Canter was a nuisance due to her requests for help and evaluations.

110.    On November 15, 2016, Ms. Canter again requested an evaluation for the gynecomastia.

111.    During several sickcalls in November and December 2016, Ms. Canter reported pain in her testicles due to her castration attempt.

     (a)    December 17, 2016 sickcall submission of sickcall slip stating that she was experiencing "extreme pain in both testicles from a castration attempt" and asked to be treated or for medical staff to "cut them off.";

     (b)    December 19, 2016 sick call slip relating the same problem.

112.    In a letter stamped received December 20, 2016, and acknowledged by Defendant Nero, Ms. Canter requested an assessment for her condition from Defendants Nero and Murphy. [ECF 1-2 at 2].   Ms. Canter stated that she was diagnosed as having gender identity disorder at Maryland General Hospital when she was admitted to the psychiatric ward from October 2012 to April 2013.   Canter provided her mother's name and phone number to verify that she has suffered from gender dysphoria since the age of 7 or 8. *Id.* at 3.   In the letter, Ms. Canter stated that Defendants Liller and Beitzel are preventing her from receiving medical treatment by refusing to provide a diagnosis of gender dysphoria or to send her out to a professional who can render the diagnosis. Ms. Canter further stated that she attempted to kill herself numerous times in the last year and that four weeks prior she attempted self-castration.   Ms. Canter also included a July 11, 2016 letter from Defendant Liller stating that "one qualifying factor for anyone seeking hormone

therapy is that hormone therapy prior to incarceration must be established." ECF 1-2 at 19.
Defendant Liller's letter also stated that Canter has "been seen by multiple mental health providers
none of whom has offered a diagnosis of gender dysphoria." *Id.*

113.    On December 28, 2016, Defendant Nero responded to a letter Ms. Canter had
written concerning the ongoing lack of treatment for her gender dysphoria by stating that he would
forward Ms. Canter's letter to Defendant Murphy for a review to ensure that Ms. Canter's issues
were properly addressed.  [D.E 1-2 p. 106 of 239 Compl.]

114.    Defendant Nero and Murphy did not comply with Ms. Canter's request, but
responded that they would support whatever course of action was recommended by Defendants
Liller and Beitzel.

115.    Throughout this period of time, Ms. Canter continued to request an evaluation and
on January 5, 2017 was placed on suicide watch.

116.    In response to an Order to Show Cause, Defendants falsely stated that Ms. Canter
"ha[d] not to [that] date been diagnosed with gender dysphoria.  In fact, Ms. Canter had been
diagnosed with gender dysphoria by healthcare providers at Maryland General Hospital.
Defendants were aware of that diagnosis.  See Declaration of Lauren Beitzel. [ECF 28-8].

117.    Defendants represented to this Court that referral with a gender identity expert, Dr.
Kraft was being made and based upon that evaluation, further consideration would be provided.
That assessment never took place while Ms. Canter was incarcerated.

118.    On July 18, 2017, while Ms. Canter was incarcerated at the Western Correctional
Institution, she was summoned to the medical office at WCI for a brief meeting with Dr. Kraft.
Dr. Kraft only introduced himself as the new chair of the Gender Disorder Committee.  Dr. Kraft
stated that he wanted to introduce himself and to advise Ms. Canter that at some date in the future

he would schedule an appointment for her evaluation. He did not make any diagnosis that day. Dr. Kraft never scheduled an appointment for an evaluation of Ms. Canter while she was incarcerated at WCI.

119. On March 26, 2018, this Court found that "the refusal to evaluate Canter for gender dysphoria perpetuated the problem because without a diagnosis, no medical treatment was available." See Memorandum Opinion [ECF 21, at p. 11].

120. On March 26, 2018, the Court found that Ms. Canter adequately alleged that Defendants were deliberately indifferent to her medical needs. Id.

### *Ms. Canter is Paroled and the Diagnosis of Gender Dysphoria is Confirmed*

121. Ms. Canter was paroled on September 5, 2017.

122. Following her release on parole, Ms. Canter was evaluated by the Johns Hopkins Hospital Gender Identity Clinic. The Gender Identity Clinic obtained Ms. Canter's medical records from Maryland General Hospital and conducted a day-long evaluation of Ms. Canter which included interviews of Ms. Canter and of her mother. In the course of that evaluation, Ms. Canter was finally evaluated by Dr. Kraft. Following that evaluation, the Johns Hopkins Hospital Gender Identity Clinic confirmed Maryland General Hospital's previous diagnosis of gender dysphoria and prescribed hormone therapy. The Johns Hopkins Gender Identity Clinic prescribed bi-weekly injections of Delestrogen (an artificial form of estrogen) and a daily tablet of Spironolactone (a testosterone blocker).

123. Sometime after February 28, 2019, at the direction of the Office of the Attorney General and Assistant Attorney General Frank Curnutte, Dr. Kraft prepared a "Note" that purported to memorialize a diagnosis on July 18, 2017. Dr. Kraft backdated the Note to July 18, 2017, at the direction of Assistant Attorney General Curnutte.

Case 8:17-cv-00008-JKB   Document 41   Filed 03/28/20   Page 27 of 51

124. However, as Dr. Kraft had not conducted an evaluation on July 18, 2017, Ms. Canter believes and therefore avers that the diagnosis contained in the Note reflects the conclusions arrived at by the Johns Hopkins Gender Identity Clinic while Ms. Canter was released on parole.

125. Ms. Canter was reincarcerated on February 23, 2019.

126. For a period of time, she was housed at the Maryland Reception, Diagnostic and Classification Center ("MRDCC").  While housed at MRDCC, Ms. Canter continued to receive her hormone therapy.  On or about July 3, 2019, while housed at MRDCC, Ms. Canter received a scheduled injection of Delestrogen.  Thereafter she was transferred to the Western Correctional Institution ("WCI").

### *Transfer to WCI and Retaliation at WCI*

127. WCI is located in Cumberland, Maryland, immediately adjacent to North Branch. The employees at the two prisons, including administrators, correctional officers and medical personnel, are all drawn from the same local community.

128. If an inmate is deemed a "troublemaker" at one institution, it is not uncommon for personnel at the other institution to engage in harassment and retaliation.

129. When Ms. Canter arrived at WCI in July 2019, correctional and medical personnel were aware of the fact that Ms. Canter had this pending action against correctional and medical personnel at North Branch.

130. Correctional and medical personnel at WCI almost immediately instituted acts of retaliation against Ms. Canter for her exercise of her constitutional rights, including the right to adequate and necessary medical care.

131. Ms. Canter had received her injection of Delestrogen on or about July 3, 2019.  As a result, she was due her next injection on or about July 17 or 18, 2019, almost immediately following her transfer to WCI.

132.    Ms. Canter requested that injection at the medical office of WCI, but was refused.

133.    Defendant Reese indicated that Ms. Canter would not be allowed her next injection until sometime in August 2019.

134.    Since Ms. Canter's transfer to WCI, Defendant Reese has repeatedly indicated that she would allow Ms. Canter an injection of Delestrogen only a monthly basis, not bi-weekly as ordered by Ms. Canter's doctors.  On information and belief, Reese is not a medical doctor, not a psychiatrist or psychologist, and not qualified to modify Ms. Canter's prescribed hormone regiment.

135.    On information and belief, Reese's desire to administer the Delestrogen monthly, rather than bi-weekly as prescribed is motivated by the cost of the medication and not any medical factor.

136.    On July 23, 2019, Ms. Canter telephoned her attorneys in this matter and advised them that WCI was refusing to provide Ms. Canter with the required hormone therapy.  Counsel for Ms. Canter contacted the attorneys at the Office of the Attorney General representing the Defendants in this matter and advised them that WCI was failing to provide Ms. Canter with the required hormone therapy.

137.    By advising the attorneys for the Secretary of the Department of Public Safety and Correctional Services, the Warden of WCI, and the other Defendants, counsel for Ms. Canter provided those persons with actual or constructive notice of the failure of medical office of WCI to provide Ms. Canter with the required medical treatment.

138.    On Thursday, July 25, 2019, counsel from the Office of the Attorney General admitted that Ms. Canter had been prescribed the two medications, Delestrogen and Spironolactone.  Counsel further acknowledged that the injection of Delestrogen was required on

a bi-weekly basis.  Counsel for the Office of the Attorney General falsely asserted that Ms. Canter had received her overdue injection on July 24, 2019.

139.    On Friday, July 26, 2019, Ms. Canter telephoned her attorneys again and advised them that she had still not received her Delestrogen injection.  Counsel for Ms. Canter wrote to counsel for Defendants on July 26, 2019, and advised her that Ms. Canter had not received the prescribed injection of Delestrogen on July 24, 2019, as the Office of the Attorney General had represented.

140.    By advising the attorneys for the Secretary of the Department of Public Safety and Correctional Services, the Warden of WCI, and the other Defendants, counsel for Ms. Canter provided those persons with actual or constructive notice of the failure of medical office of WCI to provide Ms. Canter with the required medical treatment.

141.    On Monday, July 29, 2019, Defendant Case Manager Bittinger came to Ms. Canter's cell and called her out of her cell into the hallway.  Defendant Bittinger told Ms. Canter "stop being so needy."  He further told Ms. Canter that "this is a prison" and that she could not get things like medication when she wanted them, but would get them when she got them.  He told Ms. Canter that if she wanted to remain on the honor tier, she must "back off medical" and stop calling her attorneys in Baltimore.  He further told her that, notwithstanding her prescriptions, her hormone therapy would not resume until August 2, 2019, a month after a previous injection.

142.    Defendant Case Manager Bittinger is not a medical doctor, is not a psychiatrist or psychologist, and has no training which would qualify him to change Ms. Canter's prescribed hormone therapy.

143.    Upon her transfer to WCI, Ms. Canter was housed on the so-called honor tier and assigned to a prison job that earned her ten (10) good conduct credits each month.  The honor tier is a relatively less restrictive environment.

144.    Defendant Case Manager Bittinger was threatening to move Ms. Canter to a more restrictive environment and deprive her of the opportunity to earn good conduct credit unless she stopped communicating with her counsel.

145.    Ms. Canter telephoned her attorneys that day and advised them of Mr. Bittinger's threats.  Ms. Canter's attorneys relayed that information to attorneys with the Office of the Attorney General.

146.    Therefore, as of July 29, 2019, Defendants Zeigler, Graham, and Weber had actual or constructive knowledge of threats being made against Ms. Canter for her exercise of her constitutional rights in this action and her constitutional right to adequate medical treatment.

147.    On July 29, 2019, Ms. Canter, by counsel, brought an Emergency Motion of Temporary Restraining Order, seeking an affirmative injunction to compel the Defendants to provide Ms. Canter with her prescribed medical care.  That motion remains pending before this Court.

148.    On July 29, 2019, attorneys for the Defendants falsely advised Ms. Canter's attorneys that Ms. Canter had received an injection of Delestrogen on July 18, 2019.  (Apparently, on information and belief, there was a notation in Ms. Canter's medical records that *she was scheduled for an injection of Delestrogen on July 18, 2019*.  The claim that Ms. Canter had received an injection as scheduled was false and inconsistent with the assertion only days earlier that Ms. Canter had received the required on July 24, 2019.

149.     After receiving Ms. Canter's emergency motion for temporary restraining order, WCI finally gave Ms. Canter the overdue injection of Delestrogen shortly after 6:00 p.m. on July 30, 2019.  However, the Defendant's retaliatory treatment of Ms. Canter only intensified.

150.     On August 8, 2019, Ms. Canter was called to medical for an appointment.  When Defendant Correctional Officer II Faust saw Ms. Canter he said "here comes the snitch."  When Ms. Canter requested to use to restroom while waiting for her medical appointment, Defendant Faust responded to Ms. Canter's request by removing his pepper spray can from his belt and threatening her.  He directed her to "lock in the [expletive] holding cell before I spray you."

151.     That same day, counsel for Ms. Canter relayed these facts to counsel for Defendants.  Counsel for Ms. Canter wrote:

> As you well know, Officer Faust's comments, beyond inappropriate and retaliatory, are also dangerous. **Calling Ms. Canter a "snitch" could be misunderstood by other inmates and lead to violence**. In addition, if Ms. Canter were to use this type of language toward Officer Faust, she would be punished, likely with time in segregation.

> Ms. Canter also reported to us that Sgt. Gilliam has been very helpful and respectful toward her. When Ms. Canter asked Sgt. Gilliam what to do about Officer Faust, he suggested that she contact counsel and write it up.

> We hope that your office can help locate the appropriate person to counsel Officer Faust.

152.     On August 22, 2019, Ms. Canter submitted a Request for Administrative Remedy regarding Defendant Faust's behavior.  Counsel for Ms. Canter also requested that counsel for Defendants "address this issue with prison officials."  *Id.*

153.     On August 15, 2019, Defendants stopped administering Ms. Canter's daily dose of the testerone blocker, Spironolatone.

154.    Later on August 19, 2019, personnel at WCI advised Ms. Canter that, notwithstanding her diagnosis of gender dysphoria, her hormone therapy was being "cancelled" immediately.  Ms. Canter relayed that information to her attorneys who, in turn, advised attorneys for the Defendants, of the actions of personnel at WCI.

155.    The next day, August 20, 2019, Ms. Canter was called back to the medical office at WCI and told by the director of medical services at WCI, Defendant Reese, that WCI was "tired of answering to the Attorney General's Office" and, therefore, at the direction of Defendant Sharon Baucom, M.D., the Medical Director of the Department of Public Safety and Correctional Services, WCI was making Ms. Canter's medical care Ms. Canter's responsibility.  Defendant Reese further said that, at Dr. Baucom's direction, the medical office at WCI would no longer administer Ms. Canter's daily tablet of the hormone blocker, Spironolactone.  Ms. Reese handed Ms. Canter a month's supply of the testosterone medication and told Ms. Canter that she needed to self-administer the medication in the future.

156.    As of August 19, 2019, Ms. Canter was overdue for an appointment with an endocrinologist.  Ms. Reese advised Ms. Canter that her endocrinologist was being "changed." Ms. Reese refused to explain why Ms. Canter's endocrinologist was being changed and has refused to assign Ms. Canter a new endocrinologist.

157.    On August 19, 2019, Ms. Canter advised her attorneys that Defendant Reese had failed to provide the medication for five days.  Counsel for Ms. Canter advised counsel from the Office of the Attorney General.

158.    On September 10, 2019, Ms. Reese advised Ms. Canter that Ms. Canter would not be permitted to see an endocrinologist for nine to twelve months.  Ms. Canter's attorneys relayed that fact to attorneys for Defendants, the Office of the Attorney General.

159.    On September 12, 2019, Ms. Canter began experiencing discharge from her left breast.  She has been previously advised by physicians that she should immediately seek medical attention in the event that she experiences such discharge.  Ms. Canter requested to be allowed to go to the medical office at WCI to be examined.  Ms. Reese refused to permit Ms. Canter to be seen by the WCI medical office.

160.    On September 12, 2019, Ms. Canter encountered Ryan Youngbar, the prison administrator who is responsible for processing medical requests for administrative relief brought by inmates.  Mr. Youngbar was on the honor tier.  Ms. Canter asked why she was not being permitted to visit medical to be examined for the discharge from her breast.  In Ms. Canter's presence, Mr. Youngbar telephoned Ms. Reese and asked if Ms. Canter might be seen by the medical office.  Mr. Youngbar relayed that Ms. Reese said she would not permit Ms. Canter to be seen by the medical office and that if Ms. Canter did not like Ms. Reese's decision she should contact her attorneys in Baltimore.

161.    The repeated interruptions of Ms. Canter's hormone therapy have caused Ms. Canter severe physical and mental harm and create a grave risk of additional serious harm to Ms. Canter's health.

162.    On September 13, 2019, counsel for Ms. Canter visited Ms. Canter at WCI for a legal visit.  Due to the remote location of WCI, that visit required approximately five hours of driving.  At this time, Ms. Canter was still housed on the honor tier.  Counsel was required to seek preapproval for the visit, so numerous WCI personnel were aware that Ms. Canter had met with counsel.

163.    **Two business days after meeting with counsel, on the morning on September 17, 2019, Defendant Correctional Officer Thompson approached Amber Canter's cell and**

demanded that she "sign off on," i.e., withdraw, her complaint against Defendant Faust. Ms.
Canter refused.

164.    Defendant Thompson returned to Ms. Canter's cell at approximately 5:00 p.m. on
September 17, 2019, and again demanded that Ms. Canter withdraw the complaint against
Defendant Faust.  Again, Ms. Canter refused.

165.    Defendant Thompson was visibly agitated and slammed the paperwork through the
feed up slot on Ms. Canter's cell door.  Defendant Thompson would have been captured on the
security cameras approaching Ms. Canter's cell.[4]  Officer Thompson told Ms. Canter that he is not
afraid of her "[expletive] lawyers" and that he would cause her to lose her job and all of her
privileges.

166.    At approximately 6:30 p.m. on September 17, 2019, another officer approached
Ms. Canter's cell and told her she was being transferred to "lock up."  Upon being transferred to
segregation, **Ms. Canter was told by Defendant Officer Barnes that she could go directly back
to her old cell on the honor tier if she would withdraw the complaint against Defendant Faust**.
Ms. Canter refused and, therefore, remains in segregation, locked in her cell 23 hours a day without
access to a telephone.

167.    As Defendant Bittinger had threatened on July 29, 2019, Ms. Canter was taken off
the honor tier, removed from her prison job, and placed in restrictive segregation because Ms.
Canter would not "back off medical" and stop communicating with her lawyers.

168.    When Ms. Canter was later told that her transfer was in response to a threatening
note that an officer had intercepted, Ms. Canter told the officers that she does not believe her life
is in danger (since both Officer Thompson and Officer Barnes had attributed her transfer to her

---

[4]    Counsel for Ms. Canter has requested that this evidence be preserved.

refusal to drop her complaint against Faust).[5]  Ms. Canter asked to be allowed to sign a so-called

"body waiver" and accept the risk of returning to the honor tier.  Her request was denied.  Ms.

Canter also filed a request for administrative remedy regarding her retaliatory housing assignment.

That complaint almost immediately dismissed by WCI.

169.    While in segregation, Ms. Canter is being subjected to the same terms of

confinement as prisoners who have been placed in disciplinary segregation.  Ms. Canter has lost

her prison job which paid her $60 per month and earned her 10 good conduct days each month.

She is confined to her cell for 23 out of every 24 hours.  Her opportunities for exercise and hygiene

are limited.  Her access to the telephone to speak with her lawyers is severely limited to one

morning each week and then only for 30 minutes and only if there are sufficient slots for a call.[6]

170.    While in segregation, Ms. Canter is being housed with another inmate.  Ms. Canter

and the other inmate housed in her cell are being subjected to continuous, severe and pervasive

sexual harassment by Lieutenant James Smith and Officer Robey.  The two correctional officers

repeatedly approach the cell door and make lewd and crude comments and suggestions to Ms.

Canter and the other inmate regarding their sexual orientation and expressed gender and describe

sexual acts that they might perform.  The actions of Lieutenant Smith and Officer Robey are clear

violations of the Prison Rape Elimination Act ("PREA").

171.    Ms. Canter has made complaints regarding the violations of PREA.  Counsel for

Ms. Canter has advised counsel with the Office of the Attorney General of the violations of PREA.

---

[5]    Ms. Canter does not believe her life is in danger.  The defendants have refused to identify the
nature of any such threat, or identify of the person allegedly making such a threat.  If someone
did threaten Ms. Canter, it is unclear why the Defendants would not simply put that person into
disciplinary segregation, rather than punishing Ms. Canter.

[6]    Ms. Canter can only call her counsel once between 8:00 a.m. and noon.  If undersigned counsel
happens to miss her call, there is no way to telephone Ms. Canter.

172.     Ms. Canter is under severe psychological pressure to waive her rights, withdraw her complaint against Officer Faust and stop communicating with her lawyers.  When Ms. Canter was housed on the honor tier, she telephoned undersigned counsel daily.  These numerous telephone calls have been essential to the ability to represent Ms. Canter.  Indeed, undersigned counsel has no means of calling Ms. Canter.  When Ms. Canter was transferred to segregation (for no fault of her own), she was unable to speak with her lawyers for over a week.  This has retaliatory housing assignment has interfered with Ms. Canter's right to effective assistance of counsel.

173.     Counsel for Ms. Canter raised concerns about this retaliatory conduct with counsel for defendants.  Counsel for defendants have acknowledged that Ms. Canter was not removed from the honor tier for any disciplinary reason.

174.     Counsel for Defendants have admitted that "[Ms. Canter] is not in disciplinary segregation."   Counsel for Defendants remarked that undersigned counsel did "not seem to appreciate or understand that your client is in a jail."

175.     Defendants Zeigler, Nero, Baucom, Murphy, Graham, and Weber have implemented, condoned and ratified a policy of punishing and retaliating against inmates who complain about the performance of the medical and correctional personnel who are bringing legal actions DPSCS personnel.

176.     Defendants Zeigler, Baucom, Nero, and Murphy has implemented, condoned, and ratified the custom and practice within DPSCS of denying medically necessary treatment for gender dysphoria, including hormone therapy to certain inmates, including Ms. Canter, pursuant to DPSCS's "freeze-frame" policy.

177.    Defendant Zeigler has also implemented, condoned, and ratified the custom and practice of denying inmates like Ms. Canter other forms of medically necessary treatment for gender dysphoria.

178.    Defendants Zeigler, Nero, Baucom, Murphy, Graham, and Weber have failed to train and supervise DPSCS employees and agents with respect to the proper provision of medically necessary treatment for gender dysphoria, despite knowing that gender dysphoria is a serious medical need and that failing to train and supervise staff with respect to the provision of medically necessary treatment for this serious medical need places inmates like Ms. Canter at substantial risk of mental and physical harm.

179.    Defendants Zeigler, Nero, Baucom, Murphy, Graham, and Weber are aware of retaliatory actions of Defendant Reese and the interrupting and interfering with Ms. Canter's medically necessary hormone therapy and the retaliatory actions of Officer Faust, Thompson, and Barnes in using abusive language towards Ms. Canter, removing Ms. Canter from the honor tier and placing her in restrictive conditions of segregation, and removing Ms. Canter from her prison work assignment.  Counsel for those defendants has been made aware of the retaliatory actions and, given the severity of those actions it is inconceivable that reports were relayed to the highest levels of the DPSCS.

180.    Nevertheless, Defendants Zeigler, Nero, Baucom, Murphy, Graham, and Weber have taken no action whatsoever to discipline Defendants Reese, Faust, Thompson, or Barnes for their retaliatory behavior and taken no steps to ensure that Ms. Canter receives her medically necessary hormone therapy or to return Ms. Canter to the honor tier and reinstate her in her job.

181.     Defendants Zeigler, Nero, Baucum, Murphy, Graham, and Weber have failed to train and supervise DPSCS employees and agents with respect to the propriety of retaliating against inmates for exercising their first and eighth amendment rights.

## CLAIMS FOR RELIEF

### COUNT I

Refusal to Provide Medically Necessary Care
In Violation of the Eighth and Fourteenth Amendments – Section 1983
(against all Defendants)

182.     Ms. Canter incorporates paragraphs 1 through 181 as though fully set forth herein.

183.     At all relevant times, Defendants knew that Ms. Canter has gender dysphoria, a serious medical need that jeopardizes an individual's physical health and mental well-being when not properly treated.

184.     Defendants knew that the medically accepted standards for the treatment of gender dysphoria are the Standards of Care, and that hormone therapy and social role transition, are medically necessary treatment for Ms. Canter's gender dysphoria.

185.     Defendants knew that denying Ms. Canter hormone therapy and social role transition placed her at substantial risk of serious harm, including depression, anxiety, mental impairment, physical self-harm, and suicide.

186.     Despite this knowledge and despite Ms. Canter's repeated requests for care, Defendants, while acting under color of state law, have refused to provide Ms. Canter with the medically necessary treatment for her gender dysphoria, in deliberate indifference to her serious medical needs, and in violation of the rights guaranteed to Ms. Canter by the Eight and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983.

187.     Each of the Defendants has also implemented, condoned, ratified, followed, and/or enforced, and continues to implement, condone, ratify, follow, and/or enforce a policy or custom,

having the force of law, of refusing requests to initiate appropriate and effective gender dysphoria treatment, irrespective of an inmate's medical need, and knowing that this inadequate care placed Ms. Canter at substantial risk of further mental and physical distress.

188.    Each of the Defendants has failed and continues to fail to train and supervise DPSCS and/or North Branch staff with respect to the proper provision of medically necessary treatment for gender dysphoria, despite knowing that gender dysphoria is a serious medical need and that failing to train and supervise staff with respect to the provision of medically necessary treatment for this serious medical need places inmates like Ms. Canter at substantial risk of serious mental and physical harm.

189.    Defendants' continuing denial of medically necessary care has caused irreparable harm to Ms. Canter, including severe anxiety and distress.

190.    Each of the Defendants disregarded, and continues to disregard the known or obvious consequences of their actions and inactions, as set forth herein, resulting in a serious harm to Ms. Canter.

191.    By failing to provide Ms. Canter with effective diagnosis and treatment for gender dysphoria while incarcerated, Defendants deprived Ms. Canter of her right to medically necessary treatment guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983.

## COUNT II

Intentional Infliction of Emotional Distress
(against all Defendants)

192.    Ms. Canter incorporates herein by reference the allegations contained in paragraphs 1 through 191.

193.    Defendants intentionally caused severe emotional distress to Ms. Canter by their extreme, reckless and outrageous conduct, including but not limited to:

(a)    Refusing to provide Ms. Canter with the medically necessary treatment for her gender dysphoria, in deliberate indifference to her serious medical needs despite knowledge that Ms. Canter suffered from gender dysphoria and knowledge that such an ailment, if untreated could cause serious physical and mental health issues, and despite Ms. Canter's repeated requests for care, Defendants, while acting under color of state law;

(b)    Implementing, condoning, ratifying, following, and/or enforcing, and continuing to implement, condone, ratify, follow, and/or enforce a policy or custom, having the force of law, of refusing requests to initiate appropriate and effective gender dysphoria treatment, irrespective of an Ms. Canter's medical need, and knowing that this inadequate care placed Ms. Canter at substantial risk of further mental and physical distress;

(c)    Failing and continuing to fail to train and supervise DPSCS and/or North Branch staff with respect to the proper provision of medically necessary treatment for gender dysphoria, despite knowing that gender dysphoria is a serious medical need and that failing to train and supervise staff with respect to the provision of medically necessary treatment for this serious medical need places inmates like Ms. Canter at substantial risk of serious mental and physical harm;

(d)    Repeatedly interrupting, interfering with, and suspending Ms. Canter's hormone therapy following confirmation of her diagnosis of gender dysphoria;

(e)    Failing and continuing to fail to train and supervise DPSCS and/or WCI staff with respect to the proprietary of engaging in retaliation

against Ms. Canter for the exercise of her First Amendment Rights and implementing, condoning, ratifying the transfer of Ms. Canter to administrative segregation in retaliation for her exercise of her rights under the First and Eighth Amendment and an order to compel her to cease exercising such rights.

194.     Defendants were motivated by ill-will, hatred and evil intent and their actions were malicious, unnecessary, willful, wanton, and in complete disregard for Ms. Canter's rights, safety, and welfare.

195.     As a direct and proximate result of Defendant's actions, Ms. Canter experienced severe psychological and physical complications due to Defendants' refusal to accept her previous diagnosis or diagnose her for gender dysphoria, and she has exhibited physical manifestations due to this refusal, including panic attacks, anxiety, racing heartbeat, shortness of breath, sleep disturbance, lack of appetite, suicidal thoughts, attempts at suicide, attempts of castration, leakage of the breast, and gynecomastia.

## COUNT III

Violation of Plaintiff's Civil Rights For Failure to Properly Train and Supervise – Section 1983
(All Defendants)

196.     Ms. Canter incorporates herein by reference the allegations contained in paragraphs 1 through 195.

197.     Defendants Nero, Baucom, and Nines, individually and on behalf of DPSCS, failed to properly train and supervise Defendants Ashraf, Murphy, Liller and Beitzel.

198.     Defendants Nero, Baucom, and Nines had both actual and constructive knowledge that medical and mental health care givers, including Defendants Asraf, Murphy, Liller and Beitzel, had been refusing to provide inmates, including Ms. Canter, the necessary medical treatment for her gender dysphoria, in violation of DPSCS Medical Evaluations Manual.

199.     Defendants Nero, Baucom, and Nines had actual and constructive knowledge that Defendants Asraf, Murphy, Liller and Beitzel had violated policies within the DPSCS Medical Evaluations Manual.

200.     Defendants Nero, Baucom, and Nines had actual and constructive knowledge that Defendants Ashraf, Murphy, Liller and were not disciplined for their failure to treat Ms. Canter.

201.     Defendants Nero, Baucom, and Nines had actual and constructive knowledge from Ms. Canter's numerous complaints and meetings that Defendants Asraf, Murphy, Liller and Beitzel failed to have performed their duties and failed to provide Ms. Canter the necessary medical and mental health care treatments for her gender dysphoria.

202.     As a direct and proximate result of Defendants Nero, Baucom, and Nines, while acting under color of law, failing to properly train and supervise Defendants Asraf, Murphy, Liller and Beitzel, Ms. Canter was exposed to harm from, among other things:

(a)     The refusal to provide Ms. Canter with the medically necessary treatment for her gender dysphoria, in deliberate indifference to her serious medical needs despite knowledge that Ms. Canter had been diagnosed with gender dysphoria and knowledge that such condition, if untreated, could cause serious physical and mental health issues, and despite Ms. Canter's repeated requests for care; and

(b)     The implementation, condoning, ratifying, following, and/or enforcing, and continuing to implement, condone, ratify, follow, and/or enforce a policy or custom, having the force of law, of refusing requests to initiate appropriate and effective gender dysphoria treatment, irrespective of an Ms. Canter's medical need, and knowing that this inadequate care placed Ms. Canter at substantial risk of further mental and physical distress;

203.     Ms. Canter filed numerous complaints with the Defendants, Nero, Baucom, and Nines.

204.    These complaints were ignored by Defendants, Nero, Baucom, and Nines.

205.    The failure of Defendants Nero, Baucom, and Nines to properly train or supervise Defendants Ashraf, Murphy, Liller and Beitzel amounts to deliberate indifference in violation of Ms. Canter's civil rights.

206.    Defendants Zeigler, Nero, Baucom, Graham and Weber, individually and on behalf of DPSCS, failed to properly train and supervise Defendants Reese, Faust, Thompson, and Barnes.

207.    Defendants Zeigler, Nero, Baucom, Graham and Weber had both actual and constructive knowledge that Defendant Reese was denying Ms. Canter medical and mental health care, repeatedly interrupting and suspending Ms. Canter's hormone therapy and that Defendants Faust, Thompson and Barnes were retaliating against Ms. Canter for her exercise of her first and eighth amendment rights and attempting to interfere and interfering with Ms. Canter's communications with her counsel.

208.    Defendants Zeigler, Nero, Baucom, Graham and Weber had actual and constructive knowledge that Defendants Reese, Faust, Thompson, and Barnes were violating policies, procedures and regulations of the DPSCS and applicable law.

209.    Defendants Zeigler, Baucom, Graham, and Weber did not discipline Defendants Reese, Faust, Thompson, or Barnes for their violations of the policies and procedures and regulations of the DPSCS and applicable law.

210.    Defendants Zeigler, Baucom, Graham, and Weber had actual and constructive knowledge that Defendants Reese, Faust, Thompson, and Barnes were not disciplined for their violations of the policies, procedures and regulations of the DPSCS or applicable law.

211.    Defendants Zeigler, Nero, Baucom, Graham and Weber had actual and constructive knowledge of Ms. Canter's numerous complaints that Defendant Reese was interfering with and

depriving Ms. Canter of necessary medical treatment and Defendants Faust, Thompson, and Barnes were interfering with Ms. Canter's exercise of her rights under the first and eighth amendments and attempting to and interfering with her communication with her counsel.

212.    As a direct, proximate and failure of Defendants Zeigler, Baucom, Graham, and Weber to properly train and supervise Defendants Reese, Faust, Thompson, and Barnes, Ms. Canter was exposed to harm from, among other things:

(a)    The repeated denial of necessary medical treatment for her gender dysphoria, and deliberate indifference to her serious medical needs despite knowledge of Ms. Canter had been diagnosed with gender dysphoria acknowledge that such condition, if untreated, would cause serious physical and mental health issues and despite Ms. Canter's repeated request for care;

(b)    The transfer of Ms. Canter to restrictive conditions in segregation and the deprivation of her prison job solely in retaliation for her exercise of her rights under the first and eighth amendments with the intention to and effect of interfering with her communications with counsel.

213.    Ms. Canter, through counsel, repeatedly advised attorneys from the Office of the Attorney General of the actions of Defendants Reese, Faust, Thompson, and Barnes.  Given the grave nature of the complaints, Ms. Canter believes, and therefore avers, that the Office of the Attorney General relayed Ms. Canter's complaints to the highest level of the DPSCS.

214.    The failure of Defendants Zeigler, Baucom, Graham, and Weber to properly train and supervise Defendants Reese, Faust, Thompson and Barnes amounts to a bit of indifference in violation of Ms. Canter's civil rights.

215.    Defendants actions were without justification and in violation of the rights guaranteed to Ms. Canter by the Eighth and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983.

## COUNT IV

Violation of First, Eighth, and Fourteenth Amendments – Section 1983 (Retaliation)
(All Defendants)

216.    Plaintiff incorporates by reference allegations contained in Paragraphs 1 through 215.

217.    Plaintiff has engaged the actions described above, including, but not limited to:

    (a)    Plaintiff has filed this action;

    (b)    Plaintiff has filed the request for administrative remedy detailing the abusive behavior of Officer Faust;

    (c)    Plaintiff has communicated with her attorneys in this matter regarding this action, the failure of medical personnel at WCI to provide necessary medical care, and the retaliatory conduct of medical and correctional personnel employed by the DPSCS.

218.    The activities described above constitute free speech protected by the First Amendment.  Plaintiff had a right to free speech and to seek redress of her meritorious grievances.

219.    The activities described above constitute an exercise by Plaintiff of her rights under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment.

220.    Defendants Reese, Faust, Thompson, and Barnes have retaliated against Ms. Canter for her exercise of her rights under the First, Eighth, and Fourteenth Amendments by the interrupting of her hormone therapy and depriving her of necessary medical treatment, transferring to restrictive segregation for no reason, depriving Ms. Canter of the prison job, and exposing Ms. Canter to the sexual harassment and abuse at the hands of Lieutenant Smith and Officer Robey.

221.    Defendants Zeigler, Nero, Baucom, Murphy, Graham and Weber have actual or constructive knowledge of Plaintiff's activities described above and of the retaliatory conduct of Defendants Reese, Faust, Thompson, and Barnes.

222.    Defendants Zeigler, Nero, Baucom, Murphy, Graham, and Weber have condoned and permitted to continue the retaliatory actions against Defendant.

223.    Defendants' actions were without justification and a violation of the rights guaranteed to Ms. Canter by the First, Eighth and Fourteenth Amendments to the United States Constitution.

224.    Defendants intended to intimidate Ms. Canter such that she would cease exercising her rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, the Maryland Declaration of Rights, applicable Maryland law, and the policies, procedures and regulations of the DPSCS.

225.    Defendants' actions were sufficient to deter a person of ordinary firmness in filing further complaints or continuing to pursue the pending complaints.

226.    Defendants were motivated by ill-will, hatred, and evil intent in their actions were malicious, unnecessary, willful, wanton, and in complete disregard for Ms. Canter's rights, safety and welfare.

227.    As a direct and proximate result of the Defendants' actions, Ms. Canter suffered permanent injury including physical and mental harm, extreme pain, emotional distress, humiliation, and mental anguish.

## COUNT V

### Permanent Injunction
### (All Defendants)

228.　Ms. Canter incorporates herein by reference allegations contained in Paragraphs 1 through 227.

229.　The Defendants are interfering with Ms. Canter's exercise of her rights under the First, Eighth, and Fourth Amendments by interfering with and withdrawing Ms. Canter's medically necessary hormone therapy, transferring Ms. Canter from the honor tier to restrictive segregation, and depriving Ms. Canter of her prison job which paid $60.00 per month and allowed her to earn ten (10) sentence diminution credits per month.

230.　The Defendants are retaliating against Ms. Canter for the sole purpose of compelling her to withdraw her complaints regarding medical and correctional personnel and cease contacting her lawyers regarding this litigation.

231.　Defendants' retaliatory actions are unlawful and are causing Ms. Canter severe psychological and physical harm, deprivation of her liberty, and amounts to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

232.　The harm to Ms. Canter is irreparable.　Defendants' actions are against long established constitutional principles and public policy.

233.　Ms. Canter, therefore, seeks an affirmative injunction of this Court, enjoining the Defendants from interfering with Ms. Canter's medical treatment and from continuing to retaliate against Ms. Canter for her exercise of the rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution or a Maryland declaration of rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amber Maree Canter respectfully prays for the following relief:

A.      That judgment be entered in favor of Plaintiff and against all Defendants. Declaring that Defendants' refusal to provide Ms. Canter medically necessary care related to her gender dysphoria violates the Eighth and Fourteenth Amendment to the United States Constitution;

B.      That judgment be entered in favor of Plaintiff and against all Defendants for compensatory damages in the amount of One Hundred Thousand Dollars ($100,000.00);

C.      That judgment be entered in favor of Plaintiff and against all Defendants for punitive damages in the amount of One Hundred Thousand Dollars ($100,000.00);

D.      That a permanent injunction be entered in favor of Plaintiff and against all Defendants providing:

(1)     Enjoining Defendants from further interfering with Plaintiff Amber Maree Canter's hormone therapy or other medical care and directing the Defendants to provide Plaintiff with all prescribed medications, as prescribed and all necessary medical care;

(2)     Directing Defendants to return Plaintiff Amber Maree Canter to the honor tier at Western Correctional Institution and restore Plaintiff to her prison job within forty-eight (48) hours;

(3)     Enjoining the Defendants from further retaliating against Plaintiff in connection with her security status, her housing, or her prison work assignments on account of her exercise of her rights under the First, Eighth, and Fourteenth Amendments to the United States

Constitution, the Maryland Declaration of Rights, Maryland law, or
DPSCS regulations;

(4)     Enjoining the Defendants from increasing Plaintiff Amber Maree
Canter's security classification, changing her housing assignment,
or transferring to a different institution without the prior approval of
this Court or a United States Magistrate Judge or special master
appointed by this Court to review such decisions.

E.     That Plaintiff be awarded costs, expenses, and reasonable attorneys' fees
pursuant to 42 U.S.C. § 1998 and other applicable laws; and

F.     Granting such other and further relief as the Court deems just and proper.


Dated: October 1, 2019                    /s/ _____
                                          Timothy F. McCormack, Fed. Bar No. 03565
                                          Michelle M. McGeogh, Fed. Bar No. 28778

                                          Ballard Spahr LLP
                                          300 E. Lombard Street, 18th Floor
                                          Baltimore, Maryland  21202
                                          (410) 528-5600
                                          mccormackt@ballardspahr.com
                                          mcgeoghm@ballardspahr.com

                                          *Attorneys for Plaintiff Amber Maree Canter*

## JURY DEMAND

Plaintiff demands trial by jury of all issues so triable.


/s/
Timothy F. McCormack

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 1st day of October, 2019, a copy of the foregoing

Amended Complaint, was served via ECF notification on:

> Mary Crawford, Esquire
> Assistant Attorney General
> St. Paul Plaza - 19th Floor
> 200 St. Paul Place
> Baltimore, Maryland 21202

<u>/s/</u>_____
Timothy F. McCormack