IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| AMBER MAREE CANTER, | * |
| Plaintiff, | * |
| v. | * Case No. GJH-17-908 |
| J. MICHAEL ZEIGLER, et al., | * |
| Defendants. | * |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF AMBER CANTER'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Amber Maree Canter ("Plaintiff" or "Ms. Canter"), by and through the undersigned counsel and pursuant to Rule 65 of the Federal Rules of Civil Procedure, respectfully submits this Memorandum of Law in support of her Motion for Preliminary Injunction ("Motion"). The instant Motion is supported by the Affidavit of Amber Maree Canter, attached hereto as Exhibit 1.[1]

**INTRODUCTION**

At all times relevant to this matter, Ms. Canter has been and is currently in the custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS" or the "Department") and the Defendants.[2]   At all relevant times, her medical care has been the

---

[1]   Ms. Canter has confirmed that the statements made in the Affidavit and true and correct. Counsel is currently awaiting receipt of the Affidavit signed by Ms. Canter.

[2]   The current Defendants in this action are J. Michael Zeigler, Dr. Harry Murphy, Assistant

responsibility of the Department and the Defendants. As described below and in the Second Amended Complaint (ECF 71), which is incorporated herein by reference, the Department and Defendants have refused to provide Ms. Canter with medical care. Most recently, Defendants refuse to schedule an appointment for Ms. Canter to see a urologist—for established, documented medical reasons—as recommended by Ms. Canter's doctors. For the reasons set forth below, Ms. Canter is entitled to preliminary injunctive relief to see a urologist in order to prevent further undue injury, suffering, and pain during the pendency of this action.

## STATEMENT OF RELEVANT FACTS

### A.  Plaintiff's Background

Plaintiff is a transgender woman who, during the relevant period, was and is in the custody of the Department, housed at various times at North Branch Correctional Facility, Western Correctional Institution, Eastern Correctional Institution, the Baltimore City Correctional Center ("BCCC") and Maryland Correctional Institution-Jessup ("MCI-J"), all facilities for incarcerated men. She is currently housed at MCI-J. Defendants[1] are individuals who, for the duration of Ms. Canter's incarceration, had and have authority over Ms. Canter and are responsible for her medical care.

As set forth at length in the Second Amended Complaint (ECF 71), Defendants have repeatedly refused and failed to provide adequate and necessary medical care to Ms. Canter. Defendants repeated failures have resulted in severe psychological and physical harm to Ms. Canter, including, but not limited to, physical harm resulting from Ms. Canter's attempts at self-

---

[1] Warden Jeffrey Nines, Dr. Randall Nero, Dr. Sharon Baucom, Dr. Mahmood Ashraf, Bruce Liller, Lauren Beitzel, Assistant Warden Jeff Nines, Warden Richard Graham, Acting Warden Ronald Weber, Case Manager Bittinger, Correctional Officer Faust, Correctional Officer Thompson and Correctional Officer Barnes

castration. Only following the appointment of counsel and repeated interventions by this Court have Defendants maintained a minimal level of care for Ms. Canter's gender dysphoria, specifically, hormone therapy prescribed by her endocrinologist.

### B. Denial of Prescribed Urologist Visit

On January 25, 2021, Ms. Canter was examined by Meaghan Chelsea Moxley, M.D., an endocrinologist affiliated with the University of Maryland Medical Center and the University of Maryland Corrections Clinic (Endocrinology) (the "Corrections Clinic"). In the treatment plan prepared by Dr. Moxley and contained in Dr. Moxley's report of her examination, Dr. Moxley unequivocally stated that Ms. Canter required a referral to a urologist in connection with continuing testicular pain (likely the result of a cyst, prior attempts by Ms. Canter of self-castration, or both) and consideration of so-called bottom surgery, i.e., an orchiectomy or, commonly, castration. A copy of Dr. Moxley's January 25, 2021 report is attached hereto as Exhibit 2.

On April 30, 2021, counsel for Ms. Canter wrote to counsel for the Department and the Defendants seeking a copy of the January 25, 2021 report from the Endocrinologist, which by April 30, 2021, counsel for the Department and the Defendants had still refused to provide, despite repeated requests. See E-mail exchange between counsel for Ms. Canter and counsel for the Department and Defendants, attached hereto as Exhibit 3, at pg. 6. Counsel for Ms. Canter also requested that Ms. Canter be scheduled for an appointment with a urologist consistent with the recommendation of the endocrinologist. *Id*. By May 6, 2021, counsel for the Defendants and the Department had still refused to respond to the request for an appointment with a urologist, and Ms. Canter's counsel made the request again. *Id*. at pg. 5. In response, counsel for the Defendants and the Department responded on May 10, 2021 that Ms. Canter would be seen again by the

endocrinologist, ignoring the recommendation that Ms. Canter see a urologist. See E-mail from Damon Pace, Exhibit 3 at pg. 4.

On May 20, 2021, counsel for Ms. Canter against requested that Ms. Canter be permitted to see a urologist. *Id*. at pgs 3-4. Ms. Canter's counsel wrote:

> Consistent with Ms. Canter's care plan approved by the endocrinologist, Ms. Canter should be seeing a urologist for "consideration of bottom surgery." We have repeatedly asked you when Ms. Canter is scheduled to see a urologist. However, your e-mail below references only an appointment with an endocrinologist.
>
> As requested on May 6, 2021 and April 30, 2021, please advise as to when Ms. Canter is scheduled to see a urologist as referenced in the report from the endocrinologist.
>
> If the Department of Public Safety and Correctional Services is refusing to allow Ms. Canter to see a urologist as referenced in the report from the endocrinologist, please let us know that.

*Id*.

On May 24, 2021, Ms. Canter attended a follow-up appointment and was examined again by Dr. Moxley and Rana Malek, M.D., a second endocrinologist from the University of Maryland Medical Center and the Corrections Clinic. Dr. Malek concurred with Dr. Moxley's recommendation that Ms. Canter be referred to a urologist for an evaluation and consultation and completed an outpatient referral form to document that recommendation. *See* Referral to Urology and May 24, 2021 report, attached hereto as <u>Exhibit 4</u>. Notwithstanding that two physicians twice directing that Ms. Canter be referred to a urologist for examination and consultation, the Defendants and the Department have, without good cause, refused to permit Ms. Canter to be examined by a urologist.

On June 1, 2021, counsel for the Defendants and the Department finally responded to the May 20, 2021 e-mail from Ms. Canter's counsel. *See* Exhibit 3 at pgs. 2-3. Counsel for the

Defendants and the Department wrote that "there is no basis for an appointment with urologist. I am not aware of any doctor's order or recommendation for a urologist appointment." *Id.* That same day, Ms. Canter's counsel attempted to explain that a doctor (two doctors, in fact) had recommended that Ms. Canter be evaluated by a urologist. Ms. Canter's counsel wrote:

> The Report from the Endocrinologist dated January 25, 2021[3] (that you sent to us on May 4th) reflects the Endocrinologist's view that Ms. Canter should see a urologist. That report states:
>
> [Plan: Urology referral needed for consideration of bottom surgery.]
>
> Amber met with the Endocrinologist again just a week or two ago for a follow up. At that appointment, the Endocrinologist recommended (again) a referral to a urologist. My understanding is that the Endocrinologist was disappointed to hear that her care plan noting the need to see a urologist was not followed and instead completely ignored by the DPSCS. I am awaiting the report from Ms. Canter's most recent visit with the Endocrinologist. Can you send that to me?
>
> Also, the blood in Ms. Canter's urine was not "misstated" as you assert. Honestly, such a statement is disrespectful and offensive. Just because the condition resolved without intervention does not make it a misstatement or false.
>
> Please let me know close of business tomorrow if your client is scheduling the urology appointment as recommended by the Endocrinologist.

Exhibit 3 at pgs. 1-2.

On June 2, 2021, counsel for the Defendants and the Department responded stating, without support, that "[t]here is nothing to indicate that a visit to a urologist is medically necessary at this time. As such, there is no basis for [the Department] to arrange an appointment with a urologist." Exhibit 3 at pg. 1.

---

[3] By June 1, 2021, counsel for Ms. Canter had not yet received the May 24, 2021 report from the Endocrinologist and referral to a urologist.

Defendants and prison administrators who are not medical practitioners purport to justify their inaction by stating Ms. Canter did not have a medical need to see a urologist. Significantly, this is not a circumstance of differing medical advice. The only physicians who have examined Ms. Canter have directed that she be referred to a urologist. Plaintiff believes and, therefore, avers that the prison administrators who are refusing the referral are refusing out of an anticipation that a urologist will recommend bottom surgery to alleviate Ms. Canter's pain and as therapy for her gender dysphoria.

By letter dated June 7, 2021, Dr. Malek confirmed in writing the direction of the doctors from the University of Maryland Medical Center and the Corrections Clinic that Ms. Canter be referred to a urologist, primarily for examination regarding a testicular cyst and pain resulting from a previous urological injury related to an attempted self-castration in 2014 and, secondarily, for a consultation to discuss bottom surgery. See letter dated June 7, 2021, from Rana Malek, M.D., to Stella Ross, M.D., a copy of which is attached as <u>Exhibit 5</u>.

On June 11, 2021 Ms. Canter informed counsel that Nursing Director Robinson ("Robinson") at BCCC told Ms. Canter that Ms. Canter may not be examined by a urologist because the Department anticipates that the urologist may recommend performing bottom surgery to alleviate Ms. Canter's pain and bottom surgery is beyond the scope of the medical contract between the Department and its medical provider. The Department has characterized the surgery as a cosmetic procedure as it is sometimes prescribed as part of surgical gender alignment therapy. The Department has decreed such surgery to not be a medically necessary, regardless of why it might be prescribed by a physician. According to Robinson, the Department intends to preclude endocrinologists from recommending any type of surgical procedure as a treatment for gender dysphoria. As a result, according to Robinson, the Department plans to meet with the

Case 8:17-cv-00908-JKB   Document 99-1   Filed 07/09/21   Page 7 of 19

endocrinologists associated with the Corrections Clinic—including Ms. Canter's doctors—and force them to retract their referrals for Ms. Canter.

## LEGAL STANDARD

In order to succeed on a preliminary injunction, Plaintiff must demonstrate that (1) she is likely to succeed on the merits; (2) she will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in her favor; and (4) granting the injunction is in the public interest. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Applying these standards to the instant case, the Court should grant Ms. Canter a preliminary injunction requiring Defendants to schedule her urology appointment as recommended by two board-certified endocrinologists. The refusal of the Defendants and the Department to do so is nothing short of an abuse of power, and as a result, Ms. Canter continues to unnecessarily suffer excruciating pain because of her very real, established, medical needs.

## ARGUMENT

**I.  Ms. Canter is Likely to Succeed on the Merits of Her Underlying Eighth Amendment Claim as Defendants' Withholding Medical Treatment Constitutes Cruel and Unusual Punishment.**

Given Ms. Canter's long-documented serious medical needs and the Defendants' refusal to provide the adequate medical care she is constitutionally entitled to, Ms. Canter clearly demonstrates a strong likelihood of success on the merits of her underlying Eighth Amendment claim. In order to succeed on the merits, a plaintiff must demonstrate a likelihood of success on at least one of her underlying claims. *Roe v. United States Dep't of Def.* 947 F.3d 207, 224 (4th Cir. 2020). Courts examine the (i) elements of one (or more) of plaintiff's underlying claims, and

7

(ii) evidence in the record to evaluate the merits. *See, e.g.*, *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013); *Dewhurst v. Century Aluminum Co.,* 649 F.3d 287 (4th Cir. 2011). When plaintiff provides evidence that satisfies the elements of her underlying claim(s), she has demonstrated a likelihood of success on the merits for purposes of seeking a preliminary injunction. *See League of Women Voters of N. Carolina*, 769 F.3d at 244–46 (finding a likelihood of success on the merits where plaintiff—with multiple underlying claims—had evidence that could satisfy the two elements required by the underlying Voting Rights Act claim). A defendant's lack of evidence furthers a demonstration of plaintiff's likelihood of success on the merits. *CVI/Beta Ventures v. Custom Optical Frames,* 893 F. Supp. 508, 523–24 (D. Md. 1995). A plaintiff need not demonstrate a *certainty* of success on the merits of her underlying claim(s) in order to succeed on success of the merits. *See Pashby*, 709 F.3d 307, 321 (citing *Real Truth About Obama, Inc. v. FEC,* 575 F.3d 342, 345 (4th Cir. 2009), 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2948.3 (2d ed. 1995)).

Additionally, a plaintiff must demonstrate only a likelihood of success—not a *certainty* of success—on the merits of one or more underlying claims to meet the merits requirement. *Roe,* 947 F.3d at 224; *Pashby*, 709 F.3d at 321. Courts have found a likelihood of success where a plaintiff provides evidence satisfying the required elements of at least one underlying claim. *See League of Women Voters of N. Carolina*, 769 F.3d at 244–46 (finding a likelihood of success on the merits where Plaintiff had evidence that could satisfy the two elements required by their underlying Voting Rights Act claim).

For the reasons outlined below, Ms. Canter demonstrates a clear likelihood of success on the merits given her ability to satisfy the elements of her underlying Eighth and Fourteenth Amendment claims.

### A.  Defendants' Eighth and Fourteenth Amendment Violations

Defendants have purposely refused to provide the medical care to which Ms. Canter is entitled, and, therefore, have subjected her to cruel and unusual punishment in violation of the Eighth Amendment.  The Eighth Amendment's proscription of cruel and unusual punishment applies to the States through the Fourteenth Amendment.  *See Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017); 42 U.S.C. § 1983 ("Section 1983").  To establish that Defendants subjected Ms. Canter to cruel and unusual punishment in violation of the Eighth Amendment, Ms. Canter must demonstrate that (1) the prison personnel acted with deliberate indifference (2) to her serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 105, 251 (1976); *Morris v. Bland*, 666 F. App'x 233, 239 (4th Cir. 2016).

#### 1.  Fourteenth Amendment - 42 U.S.C. § 1983.

To successfully assert a Section 1983 claim, Plaintiff must establish three elements: (1) the deprivation of a right secured by the constitution or a federal statute; (2) by a person; (3) acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Ms. Canter's claim clearly meets all three elements.  As demonstrated below, Defendants have and continue to deprive Ms. Canter of her rights guaranteed under the Eighth Amendment by subjecting her to cruel and unusual punishment.  Defendants are state employees allegedly enforcing Department policy by refusing to initiate the appropriate and effective medical care, including gender dysphoria treatment, for Ms. Canter.

#### 2.  Eighth Amendment – Defendant's Deliberate Indifference to Ms. Canter's Medical Needs

Defendants are well aware of Ms. Canter's documented medical necessities and the potential risks posed by those needs, and yet, they continue to prevent Ms. Canter from receiving the treatment and seeing the specialists prescribed to her.  In order to establish a defendant acted

with a sufficiently culpable state of mind for an Eighth Amendment claim, Plaintiff must demonstrate that the officers acted with deliberate indifference. *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). A defendant is deliberately indifferent when they know of *and* disregard the risk posed by the inmate's serious medical needs. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Courts have found this requirement met where prison personnel prevented an incarcerated person from receiving recommended treatment for serious medical needs or denied access to a physician capable of evaluating the need for such treatment. *Chessher v. Hall*, 1987 U.S. App. LEXIS 19692 (4th Cir. Feb. 25, 1987) (determining there was a constitutional violation when inmates with serious mental illnesses were effectively prevented from being diagnosed and treated by qualified professionals); *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (finding prison officials acted with a sufficiently culpable state of mind where they denied access to a physician capable of evaluating the psychiatric needs of inmates).

Defendants are well aware of Ms. Canter's medical needs and continue to deny Ms. Canter access to a physician capable of fully evaluating her for treatment. Defendants have long known of Ms. Canter's gender dysphoria, her attempt at self-castration in 2014, the discovery of testicular cyst thereafter, and Ms. Canter's consistent complaints of testicular pain. Two examining physicians have prescribed a referral to a urologist for a medically necessary evaluation of Ms. Canter's pain and testicular cyst. Defendants have refused to allow that referral, not because they have any evidence that the examination is not medically necessary, not because they have any evidence that Ms. Canter does not have a cyst and other testicular injury, not because they have any evidence that Ms. Canter is not in pain, but because Defendants fear that the urologist will prescribe an orchiectomy, a surgical procedure that is sometimes prescribed as therapy for gender dysphoria. In short, Defendants are refusing to provide Ms. Canter with necessary medical care

in furtherance of a "freeze frame" policy unrelated that that care.

Similarly to the defendants in *Chessher* and *Pierce*—where the court concluded the defendants acted with deliberate indifference—Defendants have denied Ms. Canter access to medical treatment by preventing her from seeing and being treated by the appropriate medical professional: a urologist. *Chessher,* 1987 U.S. App. LEXIS 19692; *Pierce*, 612 F.2d at 762. In fact, Defendants are even more culpable of demonstrating deliberate indifference than the defendants in the aforementioned cases. In *Pierce*, defendants withheld medical care due to the systemic issue of chronic understaffing. Even so, the court held the defendants acted with deliberate indifference. Here, Defendants continue to abuse their discretion to determine that Ms. Canter does not need medical attention simply to avoid the possibility that the urologist might prescribe a surgical procedure, ignoring the clear recommendations of physicians.

### 3. Eighth Amendment – Ms. Canter's Serious and Long-Documented Medical Need

Ms. Canter has serious and long-documented medical needs stemming from her urological injury and her gender dysphoria. A serious medical need is one that a physician has diagnosed as requiring treatment or that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)). Conditions that are associated with risk of self-harm demonstrate a serious medical need necessitating a doctor's attention. *See De'Lonta v. Angelone,* 330 F.3d 630 (4th Cir. 2003) (finding serious medical need to exist where Plaintiff was at risk of self-mutilation associated with plaintiff's Gender Dysphoria condition). Furthermore, conditions which are chronic and long-documented point towards serious medical need. *Compare Jackson v. Lightsey,* 775 F.3d 170 (4th Cir. 2014) (finding chronic and long documented heart condition to be an "undisputed" serious medical need), *with Jones v. Doe*, 2016 U.S. Dist. LEXIS 9908 (D. Md. Jan.

28, 2016) (holding no serious medical need to exist where plaintiff never originally reported gender dysphoria condition and sought treatment based on recent self-revelation that they may suffer from gender dysphoria).

In the instant case, Ms. Canter has evidence of a serious medical need based on two physician diagnoses *and* obvious to a lay person, a testicular cyst and near continuous testicular pain from her urological injury. The fact that Defendants have long known of the secondary ground for referring Ms. Canter to a urologist, her diagnosis of gender dysphoria, does not eliminate the principal need for a referral. Gender dysphoria also presents a serious medical need that jeopardizes an individual's physical health and mental well-being when not properly treated. In addition to demonstrating a serious medical need based on physician diagnosis, Ms. Canter's condition is easily recognizable as necessitating a doctor's attention. Ms. Canter's hormone therapy and social role transition put her at substantial risk of serious harm, including physical self-harm, and suicide which, according to *Agelone*, constitutes a serious medical need. 330 F.3d at 634. Additionally, Ms. Canter's condition is not a new revelation, but rather, is long-documented, making it an "undisputed" medical need.[4] *Jackson,* 775 F.3d at 174.

Defendants—who all operate as state officials—have purposely neglected their responsibilities to ensure Ms. Canter receives adequate medical treatment. Ms. Canter is ready and willing to provide evidence that satisfies all required elements of her underlying Eighth and Fourteenth Amendment claim. For that reason, Ms. Canter has a strong likelihood of success on the merits of her underlying Eighth Amendment claim and meets the success on merits requirement.

---

[4] Ms. Canter was first diagnosed in 2013 at Maryland General Hospital for a gender identity disorder now known as gender dysphoria.

## II.  Absent An Injunction, Ms. Canter Likely Faces Irreparable Harm to Her Health and Constitutional Rights.

Given Defendants' express refusal to schedule an appointment with a urologist as prescribed by Ms. Canter's physicians, she faces irreparable harm absent an injunction mandating an appointment with a urologist.  A preliminary injunction is intended to "prevent irreparable harm while a lawsuit remains pending."  *Pashby*, 709 F.3d at 319 (quoting *Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litig.)*, 333 F.3d 517, 525 (4th Cir. 2003)). Plaintiff must show that without an injunction, irreparable injury is likely to occur before the court renders a decision on the merits of the underlying claim.  *Winter*, 555 U.S. at 22.  An injury is considered "irreparable" when it cannot be redressed once it has occurred, and its occurrence would prevent courts from providing complete relief upon judgment.  *League of Women Voters of N. Carolina*, 769 F.3d at 247; *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981).  Violation of a constitutional right is, by default, an irreparable harm.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that a violation of Plaintiff's First Amendment rights "unquestionably constitute[d] irreparable injury."); *Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("[A] continuing constitutional violation constitutes proof of an irreparable harm."); *See Coreas v. Bounds*, 451 F. Supp. 3d 407 (D. Md. 2020) (finding that Plaintiff would suffer irreparable harm from their Eighth Amendment rights being violated absent an injunction*); Ross v. Meese,* 818 F.2d 1132, 1135 (4th Cir. 1987) (determining that the denial of a constitutional right constitutes irreparable harm).

If the injunction is not granted, Ms. Canter likely faces injury that cannot be redressed or measured monetarily once it has occurred.  *See Grandison v. Stanford,* 2016 U.S. Dist. LEXIS 124447 (W.D. Va. Sept. 14, 2016) (holding that Plaintiff's continued testicular pain absent an injunction demonstrated likely irreparable harm); *Buffkin v. Hooks,* 2018 U.S. Dist.

LEXIS 202875 (M.D.N.C. Nov. 30, 2018) (determining Plaintiffs would suffer irreparable harm by continuing to endure painful symptoms, including pedal edema and dermatitis, absent an injunction mandating medical care); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994) (holding irreparable injury is suffered when monetary damages would be difficult to ascertain or inadequate).

Like the plaintiffs in both *Grandison* and *Buffkin*, where the court held the plaintiffs faced irreparable harm from continued pain absent an injunction to provide the necessary medical care, Ms. Canter faces continued pain from cysts in and injuries to her genitalia. *Grandison*, 2016 U.S. Dist. LEXIS 124447 at *27 (explaining that Plaintiff's pain stemmed from an issue with Plaintiff's genitalia); *Buffkin*, 2018 U.S. Dist. LEXIS 202875 at *39–40. Such continued pain, suffering, and physical injury are also irreparable because a monetary award would be both difficult to ascertain and inadequate. *Multi-Channel TV Cable Co.*, 22 F.3d at 551. These ongoing medical issues were documented in Ms. Canter's most recent doctors' visits and were the reasons for which Dr. Malek recommended Ms. Canter see a urologist. Without an injunction, Defendants will continue to sit back as Ms. Canter endures excruciating pain and experiences irreparable harm.

Even though Ms. Canter can demonstrate irreparable harm through the undeniable pain she has and will continue to experience, Ms. Canter also faces irreparable harm by default due to the fact Defendants' behavior constitutes and ongoing constitutional violation. As posited above, Ms. Canter can demonstrate a likelihood of success on the merits for her Eighth Amendment claim. Defendants' cruel and unusual punishment in violation of Ms. Canter's Eighth Amendment rights alone entitles Ms. Canter to success on the irreparable harm element. *See Ross*, 818 F.2d at 1135 (making clear that deprivation or violation of a constitutional right constitutes irreparable harm); *see also Coreas*, 451 F. Supp. 3d at 428 (finding inmate-Plaintiff satisfied the

irreparable harm requirement where Plaintiff demonstrated a likelihood of success on the merits of their Eighth Amendment claim). Thus, absent the Court granting an injunction, Ms. Canter will continue to face irreparable injury in the form of non-redressable physical and constitutional harm.

### III. The Balance of Hardships Weigh in Amber Canter's Favor as She Faces Harm to Her Health Whereas Defendants only Face Enjoinment of a Likely Unconstitutional Practice.

Ms. Canter faces continued undue pain, suffering, and injury in the absence of an injunction whereas Defendants bear no burden if an injunction is granted. Plaintiff must demonstrate that the balance of hardships, also referred to as the balance of equities, tips in her favor. *Winter*, 555 U.S. at 20. In order to determine which party the balance favors, the court assesses the alleged injury, or injuries, of the litigants and considers the effect of granting or withholding relief on each party. *Id.* at 24. There are, however, potential impacts on a party that by default do not constitute injury. Most relevantly, the court does not consider a government entity "injured" if granting a preliminary injunction would prevent the entity from exhibiting unconstitutional conduct. *See Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (holding that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional"); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) (holding a state entity would in no way be harmed by issuance of a preliminary injunction which prevents the state from continuing unconstitutional activity). Moreover and as a general matter, the balance of hardships typically resolves in favor of preventing harm to physical health. *See Blum v. Caldwell,* 446 U.S. 1311, 100 S. Ct. 1635 (1980) (finding the balance of equities tipped in favor of Plaintiffs where elderly Plaintiffs faced loss of medical care and Defendant faced the cost of $150 million); *Tigges v. Northam*, 473 F. Supp. 3d 559 (E.D. Va. 2020) (resolving balance of equities in favor of Defendant

where Defendant's orders were protecting the health of Virginians during Covid-19 and Plaintiff was losing business at his winery).

The balance of hardships tips heavily in Ms. Canter's favor due to the unconstitutional nature of Defendant's current actions and the health hardships she would face in the absence of the injunction. Courts find the balance of hardships to weigh in favor of incarcerated persons facing health hardships in the absence of an injunction, and Ms. Canter is currently facing nothing short of hardship. *See Coreas*, 451 F. Supp. 3d at 429 (determining balance of equities between prison officials and Plaintiff to tip in favor of Plaintiff where Plaintiff faced serious health related risks from exposure to Coronavirus); *Grandison*, 2016 U.S. Dist. LEXIS 124447 at *28 (finding balance of equities to tip in Plaintiff's favor as the injunction would provide already recommended medical care and Defendant's harm—having to provide the medical care—was minimal). Additionally, Defendants face no hardship from an injunction barring Defendants from the unconstitutional act of denying access to a urologist—part of Ms. Canter's physician-prescribed medical care. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (finding that denying or delaying access to prescribed medical care of interfering with treatment demonstrates deliberate indifference to a serious medical need in violation of the Eighth Amendment); *Parham v. Johnson*, 126 F.3d 454 (3d Cir. 1997) (finding the Eighth Amendment requirement of adequate medical care violated where prison authorities prevented inmate from receiving recommended treatment for serious medical needs or denied access to a physician capable of evaluating the need for such treatment). Ms. Canter faces great hardship absent an injunction. *Coreas*, 451 F. Supp. 3d at 429 (concluding Plaintiff would experience medical hardship in the absence of injunction); *Grandison*, 2016 U.S. Dist. LEXIS 124447 at *28 (same). Showing no regard for Ms. Canter's pain and medical needs, Defendants have made it clear they will not permit Ms. Canter to see a urologist

*unless* the Court forces them to do so by granting this injunction. Ms. Canter's faces great medical hardship absent an injunction, Defendants face no hardship, at all.

### IV. The Public Interest is Served by the Injunction Because it Upholds a Constitutional Right.

The public interest is unquestionably served by upholding Ms. Canter's constitutional rights that Defendants are currently violating. A court will grant a preliminary injunction only if granting the injunction is in the public interest. *Winter*, 555 U.S. at 20. Whether an injunction is in the public interest depends on the effect of the injunctive relief on any nonparties who may possess a significant interest in the outcome. *Hughes Network Sys. v. Interdigital Commc'ns Corp.*, 17 F.3d 691, 696 (4th Cir. 1994). As a general matter, an injunction that upholds a constitutional right serves the public interest. *See Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (finding that upholding a constitutional right satisfies the public interest requirement); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (agreeing with the district court that upholding constitutional rights "surely serves the public interest"). The burden shouldered by a government agency to follow an injunction does not weigh against public interest. *See League of Women Voters of N. Carolina*, 769 F.3d at 248 (finding the effect on voting—and not burdens on the state to implement new voting procedures—to be determinative of the public interest requirement).

The public interest, which is determined by the effect of injunctive relief on nonparties, is served when constitutional rights are upheld. *See Hughes Network Sys.*, 17 F.3d at 696; Newsom, 354 F.3d at 261 (finding that upholding a constitutional right satisfies the public interest requirement); *Giovani Carandola, Ltd.*, 303 F.3d at 521 (agreeing with the district court that upholding constitutional rights "surely serves the public interest"). Any burden imposed on a government entity by the injunctive relief does not weigh against the public interest. *See Buffkin*,

2018 U.S. Dist. LEXIS 202875 at *42–43 (finding that a burden on Defendants to overhaul health services provided to inmates is not a justification to deny relief); *League of Women Voters of N. Carolina*, 769 F.3d at 248 (finding the effect on voting—and not burdens on the state to implement new voting procedures—to be determinative of the public interest requirement).

Granting injunctive relief—that would require Defendants to schedule an appointment for Ms. Canter to be seen by a urologist—serves the public interest by upholding a fundamental, constitutional right. *See e.g.*, *Hughes Network Sys.*, 17 F.3d at 696 (finding that injunctive relief which upheld Plaintiffs' constitutional rights served the public interest); *Giovani Carandola, Ltd.*, 303 F.3d at 521 (same). Significantly, the Court will lead by example and demonstrate that the constitutional rights of *all* citizens—including incarcerated persons and transgender individuals—are to be upheld. Defendants cannot simply deny Ms. Canter's constitutional right to be free of cruel and unusual punishment because they can. That is the precise abuse of power that Section 1983 is purposed to challenge. Furthermore, Defendants experience no burden by permitting Ms. Canter to be examined by a urologist.

## CONCLUSION

For all of the foregoing reasons, the Motion of Plaintiff Amber Maree Canter for Preliminary Injunction should be GRANTED.

/s/
Timothy F. McCormack
Fed. Bar No.: 03565
Michelle M. McGeogh
Fed. Bar No.: 28778
BALLARD SPAHR LLP
300 E. Lombard Street, 18th Floor
Baltimore, Maryland  21202
(410) 528-5600
mccormackt@ballardspahr.com
mcgeoghm@ballardspahr.com

*Attorneys for Plaintiff Amber Maree Canter*

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of July, 2021, a true and correct copy of the foregoing was served by the Court's ECF filing system on all parties receiving electronic notification.

/s/_____
Timothy F. McCormack